297 GA. 501
FINAL COPY

S15A0011. NEUMAN v. THE STATE.

HUNSTEIN, Justice.

Appellant Hemy Neuman was indicted and tried for murder and firearm possession in connection with the shooting death of Russell "Rusty" Sneiderman. Neuman pled not guilty by reason of insanity, claiming that he suffered from mental illness that rendered him incapable of distinguishing between right and wrong in relation to his crimes. The jury found Neuman guilty but mentally ill, and Neuman now appeals, contending that the trial court erred in ruling on the admission and exclusion of certain evidence. Because the trial court erred in admitting evidence, which was protected by the attorney-client privilege, we now reverse.[1]

---

[1] On February 8, 2011, a DeKalb County grand jury indicted Neuman for malice murder and possession of a firearm during the commission of a felony. During February 13 through March 15, 2012, Neuman was tried before a jury. On March 15, 2012, the jury returned a verdict of guilty but mentally ill on the count of malice murder and guilty on the possession count. On the same day, the court sentenced Neuman to life without the possibility of parole for the murder conviction and five consecutive years to serve on the possession conviction. Neuman filed a motion for new trial on March 20, 2012, which was subsequently amended. The trial court held a hearing on Neuman's motion for new trial on March 4, 2014, and denied the motion in an order filed March 17, 2014. Neuman filed a notice of appeal on April 10, 2014. The appeal was docketed to the January 2015 term of this Court and orally argued on

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. Shortly after 9:00 a.m. on November 18, 2010, Sneiderman was walking to his car outside of a Dunwoody daycare center after having just dropped off his son, when Neuman approached and shot him four to five times in the neck and torso. Sneiderman was pronounced dead approximately an hour later.

Neuman does not dispute that he planned and perpetrated Sneiderman's murder. He admitted that he had an affair with Sneiderman's wife, planned Sneiderman's murder, purchased a disguise and a gun, rented a car, shot Sneiderman, threw the gun in a lake, disposed of the disguise, asked the person from whom he had purchased the gun to lie to the police, and lied to the police himself. Additionally, witnesses from the scene at the daycare identified Neuman as the shooter during trial. Ballistic evidence showed that the bullets that killed Sneiderman matched the gun Neuman had purchased.

At trial, both Neuman and the State presented expert witnesses who opined on Neuman's mental capacity at the time of the shooting. Neuman's

_____

January 20, 2015.

2

experts concluded that he suffered from "bipolar disorder with psychosis, experiencing delusions," which made Neuman (1) incapable of distinguishing between right and wrong, (2) believe he needed to kill Sneiderman in order to protect Sneiderman's children from harm by their father, and (3) lie to police and take efforts to conceal his identity so that Sneiderman's wife would not know he killed her husband. Neuman's experts concluded that he was not malingering and had suffered depressive and manic episodes throughout his life consistent with their diagnosis of bipolar disorder. In rebuttal, the State presented experts who concluded that Neuman was able to distinguish right from wrong at the time of the shooting and that the symptoms and behaviors he reported were inconsistent with genuine mental illness. In particular, one of the State's experts believed Neuman was faking symptoms of mental illness, while another State expert opined that Neuman showed no signs of mental illness, hallucinations, or delusions while in jail. Additionally, the State presented testimony from numerous friends and co-workers of Neuman who stated that they had never witnessed any symptoms or behaviors consistent with a mental illness involving manic episodes, delusional thinking, or hallucinations, and that to the contrary, Neuman was high functioning.

1. Though Neuman has not enumerated the general grounds, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Neuman was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). The jury was likewise authorized to reject Neuman's insanity defense.[2] See Choisnet v. State, 295 Ga. 568 (1) (761 SE2d 322) (2014); Durrence v. State, 287 Ga. 213 (1) (b) (695 SE2d 227) (2010).

2. Neuman contends that the trial court erred in its failure to quash the subpoenas of Dr. Peter Thomas, a licensed psychologist, and Dr. Julie Rand Dorney, a forensic psychiatrist. After Neuman entered a plea of not guilty, his counsel began investigating Neuman's psychological state at the time of the shooting. At the request of Neuman's attorneys, Dr. Rand Dorney and Dr. Thomas met with Neuman to initially evaluate his psychological issues, and they reported their findings to Neuman's attorneys. Upon the advice of these doctors, Neuman's attorneys then hired an expert witness to conduct a forensic psychological evaluation of Neuman to assess his criminal responsibility. After

---

[2]See OCGA § 17-7-131 (c) (distinguishing between verdict of "not guilty by reason of insanity" and verdict of "guilty but mentally ill").

4

this expert's evaluation, Neuman changed his plea of not guilty to not guilty by reason of insanity.

Upon learning that both Dr. Rand Dorney and Dr. Thomas had met with Neuman, the State sought the doctors' records, over Neuman's objections. After two hearings, the court ordered that both Dr. Rand Dorney and Dr. Thomas "turn over all records in [their] possession concerning [their] evaluation(s) and interview(s)" of Neuman for an in camera review. After this review, the court provided the State with the doctors' notes concerning their evaluations of Neuman and Neuman's statements to them. It is undisputed that up until this time, Neuman's attorneys had never intended to call Dr. Rand Dorney or Dr. Thomas to testify at trial. However, in light of the court's rulings, the defense anticipated that the State would call the doctors as rebuttal witnesses, and therefore, needed to call them as part of the defense's case-in-chief.[3]

Neuman argues that the trial court erred in allowing the State access to the doctors' notes and evaluation of him and statements he made to the doctors

---

[3]Before calling the doctors to testify, as well as throughout the trial, Neuman reiterated his objections to the State having access to the doctors' notes and records and to presenting this evidence to the jury.

because this evidence is protected by the attorney-client privilege.[4] For reasons explained below, we agree, and we reject the State's contention that merely raising an insanity defense waives the attorney-client privilege for these communications.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," Upjohn Co. v. United States, 449 U. S. 383, 389 (II) (101 SCt 677, 66 LE2d 584) (1981), and has long been recognized in Georgia. See Fire Assn. of Philadelphia v. Fleming, 78 Ga. 733 (3) (3 SE 420) (1887). The privilege allows for open communications between an attorney and his or her client, free from apprehension of compelled disclosures, thereby enabling the attorney to gather complete and accurate information about the client's situation. See Paul S. Milich, Georgia Rules of

_____

[4]Although on appeal Neuman frames the trial court's alleged error as a failure to quash the doctors' subpoenas, there was no express ruling by the trial court on Neuman's motion to quash the subpoena for Dr. Thomas and Neuman did not file a motion to quash with regard to Dr. Rand Dorney. However, the court's orders directing that the doctors turn over their files were effectively the same ruling as a denial of a motion to quash, and Neuman continued to object to the State's access to the doctors' records and the admission of evidence at trial. Additionally, the State has not argued that Neuman did not properly preserve this issue for appeal or otherwise object to the manner in which the issue has been framed. Accordingly, we consider Neuman's enumeration of error on appeal to have been properly raised.

Evidence, § 21:1, at 857-858 (2014-2015 ed.).

From a practical standpoint, lawyers could not represent the best interests of their clients and gather complete and accurate information without assistance from a variety of individuals. In order that the attorney may properly prepare his or her case

[i]t has long been the law of Georgia, in keeping with that of other United States jurisdictions, that the attorney-client privilege "includes, by necessity, the network of agents and employees of both the attorney and client, acting under the direction of their respective principals, to facilitate the legal representation."

Davis v. State, 285 Ga. 343, 350 (676 SE2d 215) (2009) (Sears, C. J., concurring); see Taylor v. Taylor, 179 Ga. 691, 692-693 (177 SE 582) (1934); Fire Assn. of Philadelphia, 78 Ga. at 738; Milich, § 21:3, at 861. Consistent with this general principle, and after a review of authority from other states on this issue, we join numerous other jurisdictions in holding that the attorney-client privilege applies to confidential communications, related to the

matters on which legal advice is being sought, between the attorneys, their agents, or their client, and an expert engaged by the attorney to aid in the client's representation; the privilege is not waived if the expert will neither serve as a witness at trial nor provide any basis for the formulation of other experts' trial testimony. See, e.g., United States v. Alvarez, 519 F2d 1036, 1045-1047 (3d Cir. 1975) (attorney-client privilege applies to a defendant's communications with a non-testifying psychiatric expert); People v. Knuckles, 650 NE2d 974, 981 (II) (Ill. 1995) (attorney-client privilege "protects communications between a defendant who raises an insanity defense and a psychiatrist employed by defense counsel to aid in the preparation of the defense, if the psychiatrist will not testify and the psychiatrist's notes and opinions will not be used in the formulation of the other defense experts' trial testimony"); State v. Hitopoulus, 309 SE2d 747 (S.C. 1983) (a defendant's communications to a psychiatrist employed by the defendant's attorney to aid in his defense are covered by the attorney-client privilege); Houston v. State, 602 P2d 784, 789-790 (Alaska 1979) (in order for defense counsel to ascertain whether there is a valid insanity defense, an expert's examination of the defendant is protected by the attorney-client privilege, as long as testifying experts do not rely upon that expert's

report); State v. Pratt, 398 A2d 421, 424 (Md. 1979) (in criminal cases, "communications made by a defendant to an expert in order to equip that expert with the necessary information to provide the defendant's attorney with the tools to aid him in giving his client proper legal advice are within the scope of the attorney-client privilege"); People v. Hilliker, 185 NW2d 831, 833-834 (Mich. Ct. App. 1971) (confidential communications made to an attorney by a doctor or psychiatrist on behalf of the client are protected by attorney-client privilege).[5] If counsel later elects to call the expert as a witness at trial, the cloak of privilege ends.

Here, Neuman's counsel engaged both Dr. Rand Dorney and Dr. Thomas to assist in evaluating an insanity defense for Neuman. Neuman's attorneys called Dr. Rand Dorney and asked her to evaluate the case and assess whether Neuman presented any psychological issues. Dr. Rand Dorney agreed to assist Neuman's attorneys, but only as a consultant and not as an expert witness, due to her full practice load at the time. She understood her role as a consultant to

---

[5]Our holding accords with the view expressed by Professor Milich in his treatise on Georgia evidence. Milich, § 21:3, at 862 ("When the expert is not hired to be a witness but only to assist the attorney or client with a legal matter, the expert is part of the privileged network.").

9

entail working for Neuman's attorneys as an agent for the defense team, screening Neuman to assess whether there were any psychological issues, and collecting objective testing to determine if there were mental issues that needed to be explored further. Pursuant to her understanding of her role as a consultant, she met with Neuman for a few hours for a screening in an effort to find major areas of psychopathology; she did not perform a forensic evaluation for insanity or review all of the evidence in the case.

After this initial review, Dr. Rand Dorney called Dr. Thomas and asked him to perform objective testing on Neuman to see if there were any signs of major psychopathology or malingering. Dr. Thomas agreed to help Dr. Rand Dorney but emphasized that "there was no way [he] could testify because this [was not his] area." Dr. Thomas spoke with Neuman's attorneys and informed them about the nature of his expertise and what he was willing to do, and Neuman's attorneys instructed Dr. Thomas to administer some tests to Neuman and help them develop their case with a better understanding of Neuman's psychological issues. Dr. Thomas met with Neuman and explained to him that he was there at the behest of his lawyers in order to help the lawyers develop their case and that whatever Neuman discussed with Dr. Thomas was between

Dr. Thomas, Dr. Rand Dorney, and Neuman's attorneys. He performed a very brief clinical interview of Neuman as well as a psychological personality inventory. Dr. Thomas reported his results to Dr. Rand Dorney, who in turn met with Neuman's attorneys to discuss possible next steps.

At the request of Neuman's counsel, Dr. Rand Dorney and Dr. Thomas then met with Neuman at the jail for approximately three hours to review some of his test results. After this meeting, Dr. Rand Dorney informed Neuman's attorneys that further exploration of Neuman's mental issues was necessary and recommended doctors who might be able to serve as expert witnesses at trial and conduct a full evaluation of Neuman. Thus, the doctors worked at the direction of Neuman's counsel to evaluate him and assess whether he presented any psychological issues, and the doctors communicated their impressions and assessments and Neuman's own statements to his attorneys.

Neither Dr. Thomas nor Dr. Rand Dorney conducted an independent investigation of the facts of the criminal case, nor did they review any discovery. Neither doctor prepared an evaluation of Neuman's mental capacity with regard to insanity to be used in court, nor did they professionally treat Neuman. Finally, neither of Neuman's expert witnesses at trial relied on Dr. Rand

11

Dorney's or Dr. Thomas' notes in the formulation of their expert opinions.

The State argues that communications between Dr. Rand Dorney, Dr. Thomas, and Neuman are not protected by the attorney-client privilege because they were not confidential. See Davis, 285 Ga. at 347 (letters were not protected by the attorney-client privilege because they did not contain confidential communications). The State contends that Neuman signed a form, presented to him when Dr. Thomas and Dr. Rand Dorney met with him at the jail, waiving any confidentiality. The form reads, in pertinent part, as follows:

> You have been referred by Mr. Robert Rubin [Neuman's trial counsel] for an independent medical examination. The purpose of this examination is to [sic] criminal responsibility & psych testing. The examination is not confidential, nor is it for the purpose of treatment. Anything we discuss in the examination may be included in the written report or may be disclosed in court. Therefore, nothing is off the record and anything you say or do during the evaluation is not a secret. When the evaluation is complete a written report will be provided to your attorney. You do not have to participate in the examination or answer any questions you do not wish to answer. If you have questions or concerns you may ask at any time and if you want to stop the examination, you may stop at any time.

Importantly, Dr. Rand Dorney specifically explained to Neuman that she and Dr. Thomas were going to "explore . . . some of these issues on his testing, but also to report that information directly back to" only

12

Neuman's attorneys, and his attorneys would then decide how to use the information. Although the form states that the exam would not be confidential, it also states that the exam is at the referral of Neuman's attorney and information would be reported to trial counsel. When a client authorizes his lawyers or their agents, expressly or impliedly, to waive his confidential communications as necessary to carry out his representation, that does not authorize *the other party* to the litigation to demand that the waiver be exercised. See Georgia Rules of Professional Conduct, Rule 1.6 (a) ("[a] lawyer shall maintain in confidence all information gained in the professional relationship with a client . . . except for disclosures that are impliedly authorized in order to carry out the representation") and comment [6].

In addition, Dr. Rand Dorney testified that she was required to get Neuman's signature in order for him to discuss his psychological health with her, and this form, which she typically used for forensic evaluations, was the only form that she had at the time; she rarely did consulting work and did not have a form specifically for a consultation. Based on her and Dr. Thomas' roles as consultants to the defense team and her explanation

13

to Neuman, Dr. Rand Dorney did not understand this form to be Neuman's consent to a "full criminal responsibility evaluation."

After a review of this evidence, we conclude that the communications between Dr. Thomas, Dr. Rand Dorney, and Neuman at this jail meeting were intended to be confidential within the defense team and to be reported to Neuman's attorneys to better assess how to prepare his insanity defense. Our conclusion is further supported by the fact that only after Dr. Rand Dorney communicated her assessment from this meeting to Neuman's attorneys did his attorneys then seek out an expert witness to testify at trial and to conduct a forensic psychological evaluation of Neuman.

Moreover, this form only covered the one jail meeting. It did not cover the prior meetings that each doctor had with Neuman or the communications between Dr. Rand Dorney, Dr. Thomas, and Neuman's attorneys. There is no evidence to support a conclusion that these communications were intended to be anything but confidential.[6]

---

[6]The State relies on Weakley v. State, 259 Ga. 205 (2) (378 SE2d 688) (1989), to support its argument that the attorney-client privilege does not apply when an expert's report, material, or testimony does not contain confidential communications

We find that the communications between Neuman, Dr. Thomas, Dr. Rand Dorney, and Neuman's attorneys were intended to be confidential because it would foster an environment in which the doctors could probe Neuman for the truth, as part of the attorneys' assessment of the viability of an insanity defense. Thus, we conclude that the notes and records of Dr. Rand Dorney and Dr. Thomas, which the trial court ordered be turned over to the State, were protected by the attorney-client privilege.[7]

The State asserts that Neuman waived all privileges by raising an

---

between the defendant and the defendant's attorney. In Weakley, the attorney-client privilege did not apply to the testimony of a firearms expert, who had been retained by the defense, because we found that none of the testimony concerned confidential communications between the defendant and the defendant's attorney. 259 Ga. at 205. Here, however, Drs. Rand Dorney and Thomas relayed Neuman's own statements, and their notes based on these statements, directly to Neuman's attorneys. These were confidential communications.

[7]Our conclusion that the attorney-client privilege applies is not voided by the defense's decision to call the doctors to testify at trial. Neuman's attorneys made a strategic trial decision to call the doctors as part of their case-in-chief only after the trial court ordered the doctors' records be turned over to the State; they did so in an effort to contain potentially damaging testimony, rather than waiting for the State inevitably to call the doctors as rebuttal witnesses. See Harley-Davidson Motor Co. v. Daniel, 244 Ga. 284 (2) (260 SE2d 20) (1979) (noting that once it is known that the court will admit evidence over objection, trial strategy may include introducing the highly prejudicial evidence to ameliorate its effect on the jury).

insanity defense.[8] However, the attorney-client privilege is vital in cases such as this one where the defendant's sanity is at issue because the privilege allows the attorneys to consult with the non-testifying expert in order to familiarize themselves with central medical concepts, assess the soundness and advantages of an insanity defense, evaluate potential specialists, and probe adverse testimony. Pratt, 398 A2d at 424. "'Only a foolhardy lawyer would determine tactical and evidentiary strategy in a case with psychiatric issues without the guidance and interpretation of psychiatrists and others skilled in this field.'" Houston, 602 P2d at 790, n.11. Moreover, a blanket waiver of attorney-client privilege by raising an insanity defense would chill a defendant's willingness to confide in his attorneys or any defense-employed consultants or experts. Knuckles, 650 NE2d at 981; Houston, 602 P2d at 792; Pratt, 398 A2d at 424-425.

---

[8]The State contends that when a criminal defendant raises a defense challenging his mental capacity, he waives any physician-patient privilege, and that confidential communications between a psychologist and a client enjoy the same status as those between attorney and client. See State v. Herendeen, 279 Ga. 323, 327 (613 SE2d 647) (2005). However, the issue of a physician-patient privilege is not before us because the privilege only arises when the client is being seen for treatment, which did not occur in this case. See Rogers v. State, 282 Ga. 659 (6) (b) (653 SE2d 31) (2007).

16

Additionally, without the protection of privilege, the defendant's attorneys run the risk that the psychiatric expert they have hired to evaluate the defendant will render an opinion inconsistent with the defense's insanity theory and the expert will then be made an involuntary witness for the State. Alvarez, 519 F2d at 1046-1047.[9] We are mindful of the prejudice that would result if the trier of fact learns that a mental health professional, who is testifying for the State, was originally consulted and then rejected by the defense. Knuckles, 650 NE2d at 981; Pratt, 398 A2d at 425. The attorneys must be free to make an informed judgment about the best course for the defense and should not be restricted from consulting multiple experts holding possibly conflicting views due to the fear that they are creating a witness for the State. Alvarez, 519 F2d at 1047; Knuckles, 650 NE2d at 981; Pratt, 398 A2d at 425. For these reasons, we align ourselves with other jurisdictions that have rejected a waiver of attorney-client privilege merely because the defendant has placed his sanity at issue. See Alvarez, 519 F2d at 1046-1047; Knuckles,

[9]As discussed infra, this is essentially what occurred here.

17

650 NE2d at 980-981; Houston, 602 P2d at 791-792; Pratt, 398 A2d at 424-426.

Finally, the State argues that any error in providing it access to the doctors' files and in allowing them to testify was harmless. We disagree. The State used the evidence from Dr. Rand Dorney and Dr. Thomas to argue that Neuman was malingering and to impeach the statements Neuman made to defense expert witnesses who evaluated his sanity. The State cross-examined both doctors on the flaws in their assessments, including brevity and a lack of thoroughness, as well as on the issue of malingering. The State also quoted from Dr. Thomas' notes during its closing argument to support the theory that Neuman was lying or faking his symptoms of mental illness. In addition, the jury specifically requested to see Dr. Thomas' notes, which contained statements that Neuman was possibly malingering and that Neuman had told Dr. Thomas that he knew what he had done was wrong.[10] This evidence was directly

---

[10]Neuman objected to sending these notes to the jury. After hearing argument on the issue and further probing of the jury, the court seemed satisfied that the jury no longer wanted to see the notes, and therefore, they were not sent out to the jury. However, the jury's specific request shows that Dr. Thomas' evaluation may have factored into their deliberations.

contrary to the conclusions reached by Neuman's expert witnesses. In this way, Dr. Rand Dorney and Dr. Thomas, although engaged by the defense to evaluate Neuman, became involuntary witnesses for the State, whose testimony, at least in part, ultimately undercut Neuman's defense. See Alvarez, 519 F2d at 1047; Knuckles, 650 NE2d at 981; Pratt, 398 A2d at 425. Thus, we reject the State's contention that Dr. Rand Dorney's and Dr. Thomas' testimony was merely cumulative of other evidence and that any error was harmless.

Accordingly, we conclude that the trial court erred in disclosing to the State Dr. Rand Dorney's and Dr. Thomas' notes and records concerning Neuman. This evidence was not harmless, and therefore, we must reverse Neuman's conviction.

3. We now address Neuman's only other enumeration of error that may recur on retrial.[11] Neuman argues that the trial court erred by not

_____

[11]To be clear, we do not address Neuman's contentions that (1) the trial court erred by failing to allow a witness to testify about what happened with Sneiderman's wife outside the courtroom after the witness testified; and (2) the trial court erred in its failure to grant a new trial after it was disclosed that the State had used testimony from Sneiderman's wife during Neuman's trial and that she was later convicted of perjury for this testimony.

allowing the defense to introduce statements from Dr. George Warsaw, a psychotherapist. In the months prior to the shooting, Neuman and his wife participated in joint marital counseling sessions as well as individual counseling sessions with Dr. Warsaw. Neuman intended for his expert witness to state that she based her opinion in part on statements that Neuman's wife made to Dr. Warsaw, which Dr. Warsaw then recorded in his files. Neuman contends that the statements were not hearsay because they were made for medical diagnosis or treatment, see former OCGA § 24-3-4,[12] and even if they were hearsay, his expert may rely on hearsay to form the basis for her opinions. See former OCGA 24-9-67.[13]

However, we agree with the State that communications between Dr. Warsaw and Neuman's wife were privileged. Former OCGA § 24-9-21 (7),[14] in effect during Neuman's trial, protected as privileged communications between a patient and a licensed professional counselor

---

[12]Effective for proceedings on and after January 1, 2013, this exception is now codified at OCGA § 24-8-803 (4).

[13]Effective for proceedings on and after January 1, 2013, this is now codified at OCGA § 24-7-707.

[14]Effective for proceedings on and after January 1, 2013, this is now codified at OCGA § 24-5-501 (7).

during the psychotherapeutic relationship.[15]  The privilege is held only by the patient, and therefore, only the patient may waive it.  Cooksey v. Landry, 295 Ga. 430 (2) (761 SE2d 61) (2014).  It is clear from the record that although Neuman's wife waived any privilege with regard to the joint counseling sessions she and Neuman attended with Dr. Warsaw, she did not waive any privilege regarding her individual sessions with Dr. Warsaw.  Thus, statements she made during those individual sessions are privileged, and the trial court properly excluded them.

Judgment reversed.  All the Justices concur, except Melton, J., who dissents.


MELTON, Justice, dissenting.

Because there is nothing unclear about Neuman's waiver of confidentiality with respect to his communications with Dr. Thomas and Dr. Rand Dorney, I cannot agree with the majority's erroneous conclusion

---

[15]Dr. George Warsaw identifies himself as a psychotherapist with a Ph.D. in counseling and psychological services.  Regardless of whether he is actually a psychologist, psychiatrist, a social worker, or some other therapist, communications between him and his patient would be covered by the privilege.  See former OCGA § 24-9-21 (5)-(7) (now OCGA § 24-5-501 (5)-(7)).

21

that these communications were protected by attorney-client privilege. I therefore must respectfully dissent.

As the majority points out, Neuman signed a form when he met with Dr. Thomas and Dr. Rand Dorney at the jail, and this form stated in part:

> You have been referred by Mr. Robert Rubin for an independent medical examination. The purpose of this examination is to [sic] criminal responsibility & psych testing. *The examination is not confidential*, nor is it for the purpose of treatment. *Anything we discuss in the examination may be included in the written report or may be disclosed in court. Therefore, nothing is off the record and anything you say or do during the evaluation is not a secret.* When the evaluation is complete a written report will be provided to your attorney. You do not have to participate in the examination or answer any questions you do not wish to answer. If you have questions or concerns you may ask at any time and if you want to stop the examination, you may stop at any time.

This document speaks for itself, and the majority has not given any persuasive reason to support its conclusion that the document would somehow do anything other than convey a clear intention to show that the communications between Neuman and Drs. Thomas and Rand Dorney were "not confidential." It does not matter that this form "was the only [one] that [Dr. Rand Dorney] had [available] at the time." Maj. Op. at 507. What matters is that this is the document that was actually used, and that

22

this specific document signed by Neuman informed him that "nothing [was] off the record and anything [he said] or d[id] during the evaluation [was] not a secret." Nor does it matter that the written report from the evaluation was to be provided to Neuman's attorneys, because the form clearly stated that anything included in the written report from the evaluation may also "*be disclosed in court*." The fact that the attorneys would receive the report first is to be expected, but it does nothing to change the fact that the waiver form indicated that any such report could *also* be later disclosed in court and would not otherwise be confidential.

Furthermore, because Dr. Rand Dorney and Dr. Thomas met with Neuman at the jail to specifically discuss Neuman's test results that were included in their records and notes, it cannot be said that the form's statement that "[a]nything . . . discuss[ed] . . . may be included in [a] written report or may be disclosed in court" was not broad enough to cover the entirety of the communications between Neuman and the doctors. Indeed, the prior communications between Neuman and Drs. Rand Dorney and Thomas only served as the basis for any written materials that the waiver form made clear would not be confidential. The

majority's efforts to minimize the impact of this waiver form are unpersuasive.

In this connection, contrary to the majority's reasoning, the waiver form simply does not say that Neuman was only waiving "his confidential communications as necessary to carry out his representation." Maj. Op. at 507. The form states much more broadly that the communications were "not confidential" and that "[a]nything" discussed "may be disclosed in court," *without specifying that only Neuman's attorneys would be authorized to make such court disclosures.* Further underscoring the broad nature of the waiver, the form then goes on to indicate that "nothing is off the record" and that anything said or done with Drs. Rand Dorney and Thomas would "not [be] a secret." In the absence of this waiver form signed by Neuman, I would agree with the majority that the communications between Neuman and Drs. Rand Dorney and Thomas were protected by attorney-client privilege. However, I cannot ignore the plain language of the broadly drafted waiver form indicating otherwise. The majority, on the other hand, is straining to narrowly interpret the plain language of the waiver form in an effort to broaden the scope of the

24

attorney-client privilege here when we should instead be construing the attorney-client privilege as narrowly as possible:

> The attorney-client privilege protects communications between the client and the attorney that are *intended to be confidential; the protection does not extend to communications which are not of a confidential nature. . . .* Indeed, the statutes outlining the attorney-client privilege are not broadly construed; the attorney-client privilege embodied in [former] OCGA § 24-9-24 has been confined "to its narrowest permissible limits." Inasmuch as the exercise of the privilege results in the exclusion of evidence, a narrow construction of the privilege comports with the view that the ascertainment of as many facts as possible leads to the truth, the discovery of which is the object of all legal investigation.

(Citation and punctuation omitted; emphasis supplied.) Davis v. State, 285 Ga. 343, 347 (6) (676 SE2d 215) (2009) (Letters that did not contain confidential information and were not between client and his attorneys, but were between private investigator and client's attorneys, were not protected by attorney-client privilege). Because I believe that the majority is incorrect for having concluded that the notes and records of Drs. Rand Dorney and Thomas were subject to the attorney-client privilege under the circumstances of this case, I must respectfully dissent.

25

Decided June 15, 2015 – Reconsideration denied July 13, 2015.

Murder. DeKalb Superior Court. Before Judge Adams.

<u>Miller & Key, J. Scott Key; Peters, Rubin & Sheffield, Douglas N. Peters, Robert G. Rubin</u>, for appellant.

<u>Robert D. James, Jr., District Attorney, Anna G. Cross, Deborah D. Wellborn, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General</u>, for appellee.