In the Supreme Court of Georgia

Decided: February 4, 2019

S18A1031. McKELVIN v. THE STATE.

BENHAM, Justice.

Appellant Joshua McKelvin was convicted of murdering Marilyn Patterson and assaulting Myra Youngblood, Belinda Hines, and Zeddie Holley. On appeal, Appellant contends that the trial court erred by concluding that the defense of involuntary intoxication necessitated pretrial notice to the State; by requiring him to provide the State with a copy of his pretrial mental evaluation; by refusing to excuse a juror and declare a mistrial; by admitting certain rap lyrics into evidence; and by denying a mistrial after, he says, evidence placed his character at issue.[1]  Finding no reversible error, we affirm.

---

[1] In August 2013, a Turner County grand jury indicted Appellant as follows: malice murder (Patterson), three counts of aggravated assault with a deadly weapon (Youngblood, Hines, and Holley), and four counts of possession of a firearm during the commission of a felony.  Following a trial conducted March 31 – April 2, 2015, a jury found Appellant guilty on all counts.  The trial court sentenced Appellant to life imprisonment without parole for malice murder, 20 years' imprisonment for each count of aggravated assault (to run concurrent with the sentence for malice murder), and consecutive five-year prison terms for each of the weapons charges, for a total

In June 2013, Appellant and Patterson were staying together in a room at the Ashburn Inn in Turner County, Georgia, and found work at a nearby watermelon farm. On the day in question, Appellant became frustrated with the pace of work on his watermelon-packing line and hit Youngblood with a watermelon; a verbal altercation ensued between Appellant and Youngblood's fiancé, but it was settled without escalation. Later that evening at the motel – where other workers from the watermelon farm were also staying – Appellant tried to reignite the feud, but he was ignored. That same night, Patterson announced that she was checking out of the motel, taking the refund from her pre-payment of the room, and heading home.

In preparation for leaving, Patterson returned to her room, and, shortly thereafter, called the front desk asking for help; the clerk then heard at least three gunshots and gasps from Patterson. Holley, who was also staying at the motel and was acquainted with Appellant, heard the gunshots and observed Appellant leave Patterson's motel room with something silver in his hand;

---

sentence of life imprisonment without parole plus 20 years.

Appellant timely filed a motion for new trial on April 20, 2015, which was amended in March 2016. The trial court denied the motion as amended in June 2017. Appellant timely filed a notice of appeal. This case was docketed to the August 2018 term of this Court, and thereafter submitted for a decision on the briefs.

Appellant then aimed the firearm at Holley and fired three times. Appellant then shot both Youngblood and another co-worker, Hines, before fleeing the scene. Appellant later contacted law enforcement to turn himself in and was taken to the hospital as a precaution. Numerous witnesses identified Appellant as the shooter. At trial, Appellant admitted that he was the shooter, but claimed that he had no recollection of the events after having had two sips of an odd-tasting beer.

1. Though not raised by Appellant as error, in accordance with this Court's standard practice in appeals of murder cases, we have reviewed the record and find that the evidence, as stated above, was sufficient to enable a rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. In July 2013, the defense moved the trial court for a psychiatric evaluation to explore Appellant's fitness to stand trial, as well as to assess his mental condition at the time of the crime; this motion was served on the State. The order granting the motion – which was drafted by the defense – was also provided to the State, and the order dictated that the State was to receive a copy

3

of the evaluation. During the subsequent evaluation, Appellant reported that, on the evening in question, he had been given a beer with an "odd" taste to it and that he had an "incomplete memory" of subsequent events. The evaluating psychologist opined in his report that Appellant was competent to stand trial, that there was insufficient evidence to suggest that Appellant could not appreciate right from wrong at the time of the shootings, that Appellant's actions were not the product of a delusional compulsion, and that there was no apparent evidence of involuntary intoxication or misapprehension of fact. Despite the trial court's original order, the psychologist's report was apparently filed under seal and provided to defense counsel, but it was not immediately provided to the State.

Months later, the defense produced a witness list that included medical personnel who had treated Appellant on the night in question. The State – apparently concerned with a possible insanity defense – moved the trial court to compel Appellant to turn over the report and provide written notice of "any mental defect or condition that would bear upon his competency to stand trial or his lack of criminal responsibility for his actions." Following an ex parte hearing with the defense – during which the defense affirmed its intention to

4

pursue the theory of involuntary intoxication – the trial court granted the State's motion, concluding that, under Uniform Superior Court Rule 31.5, the defense was required to give notice of its intent to pursue involuntary intoxication and turn over the report. Following the trial court's ruling, the defense retained an expert witness, who testified at trial in support of Appellant's theory of involuntary intoxication.

On appeal, Appellant contends that it was error to require him to give notice of his defense and turn over the psychologist's report to the State.

(a) Appellant first contends that the trial court erred in concluding that, under Rule 31.5, the defense was required to provide written, pre-trial notice of its intent to pursue a theory of involuntary intoxication. We disagree.

Rule 31.5 requires written, pre-trial notice to the State where an accused intends "to raise the issue that [he] was insane, mentally ill or mentally retarded at the time of the act or acts charged against the accused." Though involuntary intoxication is not specifically referenced in the rule, that defense "is one involving issues of mental competence, in effect, temporary insanity." Crossley v. State, 261 Ga. App. 250, 251 (582 SE2d 204) (2003). Indeed, the involuntary intoxication statute, OCGA § 16-3-4 (a), tracks the language of the insanity

5

statute, providing that involuntary intoxication is only a defense where an accused can demonstrate that he "did not have sufficient mental capacity to distinguish between right and wrong in relation to such act."  Compare OCGA § 16-3-2 ("A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence." (Emphasis supplied.)).  Georgia courts have understood for decades that the defense of involuntary intoxication is coextensive with the defense of insanity, recognizing that "[t]he law of intoxication contained in OCGA § 16-3-4 must be read in light of OCGA § 16-3-2." Foster v. State, 258 Ga. 736, 743-744 (374 SE2d 188) (1988).  See also Carter v. State, 248 Ga. App. 139 (2) (546 SE2d 5) (2001) (discussing the relationship between involuntary intoxication and insanity); Rauschenberg v. State, 161 Ga. App. 331, 331 (291 SE2d 58) (1982) (recognizing that, "Georgia law presumes the sanity of a defendant" and that the defense of involuntary intoxication requires an accused to "establish he did not have sufficient mental

6

capacity to distinguish between right and wrong in relation to such act").[2]

Accordingly, though involuntary intoxication is not specifically referenced in Rule 31.5, the trial court correctly concluded that pre-trial notice of that defense is required since it is a subset of an insanity defense.

(b) Appellant further asserts that he was not required to give pre-trial notice of his intent to pursue involuntary intoxication because he sought to present the defense solely through lay witnesses. While Appellant is correct that, under the version of Rule 31.5 in effect at the time of trial,[3] there was no pre-trial notice requirement where an insanity-type defense was to be pursued exclusively through lay witnesses, see Abernathy v. State, 265 Ga. 754, 755 (462 SE2d 615) (1995), the trial court clearly concluded – and the record supports – that Appellant's defense depended on more than lay-witness testimony. As his witness list indicated, Appellant intended to call emergency medical technicians and an emergency-department physician who treated Appellant on the night of his arrest. At the ex parte hearing on the State's

---

[2] Though Rauschenberg was decided under Ga. Code. Ann. § 26-704, that provision is a predecessor of OCGA § 16-3-4 and is materially identical to it.

[3] Rule 31.5 was amended effective July 2017.

motion to compel, the defense acknowledged that it would seek to elicit testimony from the those medical personnel regarding their observations and treatments of the defendant on the night in question. That, alone, could constitute lay-witness testimony. See United States v. Henderson, 409 F3d 1293, 1300 (3) (11th Cir. 2005) (recognizing that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party." (Quotation marks and citations omitted.)).[4] However, the defense also sought to explore other avenues of testimony, namely the results and implications of Appellant's drug and alcohol tests on the night in question, both of which were negative.

The transcript from the hearing reflects that trial counsel explained that he planned to ask "the doctor about the drug test, what it did test for and what it did not test for to show there are certainly other types of drugs that are out there that were not tested for. Certainly, there could have been one that he was under the influence of." Thus, the anticipated purpose of the physician's testimony was

---

[4] This case was tried under Georgia's new Evidence Code, and this Court may look for guidance from the Eleventh Circuit in applying these new rules. See Davis v. State, 299 Ga. 180 (2) (787 SE2d 221) (2016).

8

not in simply reporting that the drug and alcohol screen was negative – indeed, that would have been of no benefit to the defense – but in exploring what testing the physician ordered, what substances he did not test for, and whether Appellant *could* have been on those substances. Such testimony and inferences by the physician require scientific or specialized knowledge, see OCGA § 24-7-701 (a) (3), and veer into the realm of expert-witness testimony, see Henderson, 409 F3d at 1300 (noting that "the ability to answer hypothetical questions is the essential difference between expert and lay witnesses" (Quotation marks and punctuation omitted.)). As such, Appellant was not, as he suggested, supporting his defense solely with lay-witness testimony. Accordingly, the trial court did not err when it decided that, under Rule 31.5, Appellant was required to provide written, pre-trial notice of his intention to pursue the defense of involuntary intoxication.

(c) Appellant also contends, relying on Neuman v. State, 297 Ga. 501 (773 SE2d 716) (2015), that the trial court erroneously required him to turn over the psychologist's report to the State. There is no error.

In Neuman, the trial court required the defendant to turn over records from two psychologists, who had been retained by trial counsel for the purpose of

9

exploring an insanity defense, even though those experts would have neither testified at trial nor contributed to the opinion of the expert who would ultimately testify. 297 Ga. at 505-506. This Court reversed, concluding that "the attorney-client privilege applies to confidential communications, related to the matters on which legal advice is being sought, between the attorneys, their agents, or their client, and *an expert engaged by the attorney to aid in the client's representation*" and, further, that the privilege remains intact so long as "the expert will neither serve as a witness at trial nor provide any basis for the formulation of other experts' trial testimony." (Emphasis supplied.) Id. at 504.

Here, in contrast to Neuman, the psychologist who evaluated Appellant was neither an expert retained by trial counsel nor acting to aid trial counsel in his representation of Appellant. Instead, the psychologist was working at the direction of the trial court; indeed, the report clearly reflects that the evaluation was being conducted to develop recommendations for *the court*, and the resulting report was addressed and transmitted to the same, with a *copy* provided to defense counsel.[5] Thus, Neuman does not control here, and this argument is

---

[5] There is no argument that the trial court failed to properly keep the evaluation under seal until such time as Appellant announced his intention to pursue a defense

without merit.

3. Early during trial, Appellant moved the trial court to remove a sleeping juror. The trial court granted the motion after the parties, joined by the trial court, agreed that the juror had been consistently napping; the juror was replaced with the sole alternate juror. Later, Appellant moved the trial court to excuse Juror H on the basis that he had been sleeping and, in the absence of additional alternative jurors, for a mistrial. After a brief hearing, which included an on-the-record discussion with the juror, the trial court denied the defense's request. Appellant argues on appeal, as he did below, that the juror should have been removed and a mistrial declared.

OCGA § 15-12-172 vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings, see Smith v. State, 298 Ga. 357 (3) (782 SE2d 26) (2016), and such a decision is reviewed by this Court for abuse of discretion, see State v. Clements, 288 Ga. 640, 645 n.5 (715 SE2d 59) (2011). Here, trial counsel moved to excuse Juror H and for a mistrial after complaining that the juror had been consistently "asleep" in the two hours

of involuntary intoxication, see Uniform Superior Court Rule 31.5.

after reconvening from lunch. The transcript reflects, however, that the accounts of Juror H's attentiveness were neither unanimous nor conclusive. While the trial court had observed Juror H "nodding off" – and had coughed to rouse the juror – one of the prosecutors indicated to the court that Juror H had been awake, attentive, and taking notes as the State presented its witnesses. Likewise, the transcript reflects that the trial court learned from the bailiff and other deputies that Juror H's eyes were open and that he was taking notes. When the trial court interviewed Juror H on the record, the juror acknowledged that staying awake and paying attention was "just hard," but also indicated that he had been taking notes; the trial court counseled the juror to stay awake and pay attention.

Despite trial counsel's protestations, it is not at all clear how much, if any, Juror H was actually sleeping during the two-hour window. In light of the conflicting accounts of Juror H's attentiveness, the trial court did not abuse its discretion in merely counseling the juror to stay focused and proceed with trial. See Smith v. State, 284 Ga. 17 (4) (663 SE2d 142) (2008) (no abuse of discretion in retaining a juror where there was conflicting evidence concerning whether the juror was sleeping, the alleged dozing was limited, and the court

12

counseled the juror in question). Further, because the trial court did not abuse its discretion in denying the motion to excuse Juror H, Appellant's argument that the juror's excusal would have necessitated a mistrial is moot.

4. At trial, the State was permitted to adduce handwritten rap lyrics that had been drafted on the reverse side of an inmate-request form from the Sumter County Sheriff's Office; the writing had been found among Appellant's possessions in the motel room.[6] Appellant contends that the lyrics themselves were inadmissible, as irrelevant and improper character evidence.[7] Appellant also contends that his character was further placed at issue when the jury heard testimony that the lyrics were written on the back of an inmate-request form and, as a consequence, that the trial court should have granted a mistrial.

---

[6] The lyrics in question are as follows:

> All I know is keep my trigga finga clutching on my b*tch Berreta backed up by Smith 'n' Wesson / no shellings / no witness / no telling

> I look back at the time/ when mama was on her knee praying for her youngest child / asking God to guide / [indecipherable] but I was young buckwild [scribbles and crossed-out writing]

[7] Appellant makes a passing reference that the trial court denied a motion for mistrial related to the admission of the rap lyrics. Appellant does not provide a record cite to support this claim, and our review of the transcript reveals no such motion.

13

Even if we presume that the rap lyrics were inadmissible, any error was harmless. As Appellant acknowledges in his brief, aside from being located along with his possessions, there was no testimony as to the origin of the lyrics, who wrote them, or how they were connected to Appellant. In light of the tenuous connection between the lyrics and Appellant, as well as the overwhelming evidence of Appellant's guilt, we conclude that it is "highly probable that the error did not contribute to the verdict." (Quotation marks and citations omitted.) Rivera v. State, 295 Ga. 380 (761 SE2d 30) (2014).

As to the jury's hearing that the lyrics were drafted on the back of an inmate-request form, this argument also does not require reversal. The testimony in question occurred as follows:

> Q. What is next?
> A. And now we have Exhibit 33, and that's going to be on the back of that Sumter County –
> Q. Okay. And that was the lyrics that you found.
> A. That is. Billy actually first found it.

As the above-quoted exchange reflects – and the trial court mentioned during a subsequent hearing outside the presence of the jury – the prosecutor successfully cut off the witness before he completed his answer. Thus, the jury did not hear the testimony about which Appellant complains. Moreover, even

14

if the testimony had been heard by the jury, it is not at all clear what inference would be drawn from that information.  At most, it would be a passing reference suggesting that the defendant had previously been incarcerated.  Such a brief reference, however, would neither place the defendant's character at issue nor give rise to reversible error.[8]  See Jordan v. State, 303 Ga. 709, 714 (814 SE2d 682) (2018) (noting that a passing reference to defendant's prior incarceration does not place defendant's character in evidence).  For this same reason, the trial court did not abuse its discretion when it denied Appellant's motion for a mistrial.  See id.  Accordingly, this argument is without merit.

Judgment affirmed.  All the Justices concur.

---

[8] It is unclear from the record whether the rap-lyric exhibit was submitted to the jury showing that the lyrics were drafted on the backside of an inmate-request form, and, if so, whether Appellant objected to the exhibit on that basis. Nevertheless, given how little attention was placed on this form and the overwhelming evidence of guilt, any possible error is harmless.

15