**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**August 1, 2018**

# In the Court of Appeals of Georgia

A18A1180. PHILLIPS v. THE STATE.

BARNES, Presiding Judge.

A jury found Tatiana Chimere Phillips guilty of family violence aggravated assault and reckless conduct based on evidence that she shot her boyfriend, and the trial court denied her motion for new trial. On appeal, Phillips contends that the trial court committed reversible error by excluding, as a discovery sanction, certain jail medical records that would have shown that she received significant injuries during the shooting incident and thus would have corroborated her claim of self-defense. As explained below, because there was no showing that the discovery violation was done in bad faith, the trial court abused its discretion in imposing the harsh sanction of excluding the jail medical records. Furthermore, we cannot say that the exclusion of

the records was harmless under the circumstances of this case. Accordingly, we reverse Phillips's convictions and remand the case for a new trial.[1]

*The Shooting Incident.* "Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to sustain the verdict." *Anthony v. State*, 317 Ga. App. 807, 807 (732 SE2d 845) (2012). So viewed, the evidence showed that Phillips and her longtime boyfriend lived together with their children in DeKalb County, Georgia. Their relationship was sometimes violent, and in a prior incident, Phillips had stabbed her boyfriend during a fight.

During the early morning hours on the day of the shooting incident, Phillips and her boyfriend were driving home from a club when they got into a physical altercation over whether Phillips had been speaking with another man on her cell phone. Later that morning, after Phillips and her boyfriend were back home with their children, Phillips shot her boyfriend, paralyzing him from the waist down. Phillips called 911 after the shooting. She hid the handgun underneath a mattress before the police arrived.

---

[1] The State is entitled to retry Phillips because the evidence was sufficient to sustain the verdict, as explained infra in Division 1. See *Lively v. State*, 262 Ga. 510, 511 (3) (421 SE2d 528) (1992).

*The Police Investigation.* The responding police officers found Phillips's boyfriend lying face down in the front yard, approximately five to ten feet from the front door, with his head facing toward the street. He had been shot in the back. The police spoke with a driver who was passing by Phillips's home when she heard the gunshot. The driver told the police that upon hearing the shot, she turned and looked toward the home, where she saw Phillips's boyfriend collapsing on the ground in the front yard "right next" to the porch and Phillips standing in the front doorway. After interviewing the driver, the police secured a search warrant for Phillips's house, where they found the loaded nine millimeter handgun concealed under the mattress. The police also found a nine millimeter shell casing in the living room.

Both Phillips and her boyfriend initially gave false accounts of the shooting. Phillips's boyfriend told the responding officers and detectives at the hospital that he had been shot by a male whom he did not know. Phillips first told the 911 operator that her boyfriend had been cleaning a gun when it went off, but she then told the operator that she was in the bedroom when someone came to the home and shot her boyfriend. Phillips told the responding officers and detectives that she had been asleep in the bedroom when she was awakened by the gunshot, after which she went outside and saw her boyfriend lying on the ground. However, after detectives told

3

Phillips that her account was inconsistent with the evidence that the police had gathered at the scene, Phillips admitted that she had fired the gun in the direction of her boyfriend as he was running toward the front door after physically assaulting her. Phillips claimed that she had not intended to hit him. Phillips also spoke with her boyfriend's cousin on the day of the shooting and admitted that she shot her boyfriend, but she gave no reason for why she did so.

*Circumstances Surrounding the Shooting.* Phillips was indicted and tried before a jury for family violence aggravated assault and aggravated battery. At trial, the State's theory of the case was that Phillips shot her boyfriend in an act of revenge as he was attempting to leave their home after they had stopped fighting. In support of the State's case, the boyfriend testified that although he and Phillips had physically fought in the car that morning over her cell phone call, after they returned home, the fighting had stopped. According to the boyfriend, Phillips then came into the bedroom unprovoked with a gun in her hand and told him that "[s]he was getting ready to shoot [him]." The boyfriend testified that he was frightened for his life, headed for the front door, and got about ten steps out of the house when Phillips shot him in the back.

In contrast, the defense's theory of the case was that Phillips fired the gun as a warning shot in an act of self-defense as her boyfriend was violently attacking her near the front door. Phillips testified that when they returned home that morning after the fight in the car, her boyfriend began arguing with her again about the phone call. According to Phillips, her boyfriend became enraged and began punching her, choking her, and pulling out her hair, leading her to retrieve the gun because she was scared for her life. Phillips testified that her boyfriend continued to hit her after she got the gun, and that she tried to go out of the front door, but that her boyfriend pulled her back by the hair. Phillips further testified that she then fired the gun as she was struggling with her boyfriend as he attacked her at the open front doorway, and that she had intended to fire a warning shot to scare her boyfriend. Her boyfriend jumped away from the front porch when she fired the gun and the bullet struck him as he jumped, Phillips maintained.

*The Dispute Over Visible Injuries.* One of the issues at trial was whether Phillips had any visible injuries requiring medical treatment that would corroborate her contention that she was violently attacked by her boyfriend when she fired the gun. Phillips's boyfriend testified that while Phillips told him that she was bruised and that her nose was broken, he did not see any bruising or injuries on Phillips that

5

day. The responding officers testified that they did not see any injuries on Phillips and that she did not complain of any injuries or request medical treatment. The 911 operator testified that Phillips did not indicate that she had any physical injuries that needed treatment, and a paramedic testified that Phillips's boyfriend was the only person she medically treated at the scene. Additionally, the State introduced a photograph taken of Phillips when she was booked into the jail after her arrest to show that she had no facial injuries.

In contrast, Phillips testified that she had scratches and bruises all over her body and a bloody and broken nose after her boyfriend attacked her, requiring her to obtain medical treatment at the jail. Phillips also testified that her boyfriend had pulled out several of her hair braids, and that the loose braids could be seen in photographs of the crime scene introduced by the defense. According to Phillips, she had been placed in the jail infirmary due to her injuries and received medical treatment there. Phillips further asserted that her braids obscured her injuries in her initial booking photograph. The defense also introduced into evidence a supplemental police report, which had been prepared by the now-deceased lead detective on the date of the shooting. The report included statements by the detective that he could see scrapes on Phillips's nose, face, and cheek, a lump on her forehead underneath her

6

hair, and bruises on her face and neck, and the report stated that a crime scene investigator had arrived at the police station to photograph the injuries.[2] Additionally, the defense introduced into evidence the supporting affidavit for an arrest warrant for the boyfriend that had been submitted by the lead detective that included allegations that the boyfriend had left visible bruises on Phillips by punching and beating her in the face, as well as the arrest warrant that was issued by a magistrate but never served on the boyfriend.

*The Excluded Jail Medical Records.* During the defense's case-in-chief, defense counsel for the first time obtained 17 pages of jail medical records reflecting that Phillips was housed in the jail infirmary for several days after her arrest. Defense counsel sought to introduce the medical records into evidence through the jail's custodian of records and described in a proffer what was contained in them, including observations by medical staff of a large hematoma on Phillips's forehead, bruising around her eye, and swelling and bleeding from her "out-of-slope" nose. The medical records also stated that an x-ray had been requested "because of a blunt trauma to the nose and forehead contusion," and the records contained a description by Phillips of

---

[2] The photographs referenced in the detective's supplemental police report were never located, and the State noted that the photographer named in the report had previously attempted to evade service.

the physical altercation that led to her injuries. Defense counsel stated that he had repeatedly discussed his efforts to obtain the jail medical records with the prosecutor originally assigned to the case,[3] and the State received the records at the same time as the defense.

The State objected to the introduction of the jail medical records, contending that the defense had opted into reciprocal discovery but had failed to timely produce the records under those discovery procedures. After hearing from defense counsel and the prosecutor, the trial court granted the State's motion, excluding the records as a discovery sanction, noting that defense counsel could have asked the court for assistance in securing the records in a more timely manner rather than announcing ready for trial. Later, during closing argument, the prosecutor emphasized to the jury that there was no medical testimony that Phillips had been injured and that the jury had not been provided with any doctor reports reflecting any injuries to her.

*The Verdict.* After hearing the conflicting testimony, the jury found Phillips guilty of family violence aggravated assault and reckless conduct as a lesser included offense of aggravated battery. The trial court later ruled that the reckless conduct

---

[3] The prosecutor originally assigned to the case had a medical emergency on the eve of trial, with the result that a different prosecutor was assigned the case on the day the trial began.

8

offense merged into the aggravated assault offense for sentencing purposes. Phillips was sentenced to 20 years, to serve 15 years in confinement and the remainder on probation. Phillips filed a motion for new trial, as amended, which the trial court denied. This appeal followed.

1. Although not specifically enumerated as error, we conclude that the evidence discussed above, including the boyfriend's testimony, was sufficient to sustain Phillips's convictions. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact.").

2. Phillips contends that the trial court abused its discretion by excluding the jail medical records as a discovery sanction. According to Phillips, the trial court was not entitled to exclude the records without evidence of bad faith, and there was no such evidence in this case. We agree.

Once a criminal defendant opts into reciprocal discovery, the provisions of OCGA § 17-16-1 et. seq. apply to the case, *Webb v. State*, 300 Ga. App. 611, 613 (685 SE2d 498) (2009), and the trial court has broad discretion to remedy violations of those provisions. *Marshall v. State*, 230 Ga. App. 116, 118 (2) (495 SE2d 585) (1998). Here, it appears that the trial court excluded the jail medical records because

9

Phillips, having opted into reciprocal discovery, had not made the records available to the State at least five days before trial as required by OCGA § 17-16-4 (b) (1),[4] and that the court sanctioned the defense by excluding the records pursuant to OCGA § 17-16-6.[5] But, under OCGA § 17-16-6, a trial court is authorized to impose the severe sanction of excluding evidence for a discovery violation only if the State shows, among other things, that the defendant acted in bad faith. *Massey v. State*, 272 Ga. 50, 52 (4) (525 SE2d 694) (2000); *Webb*, 300 Ga. App. at 614; *Ware v. State*, 298 Ga.

---

[4] OCGA § 17-16-4 (b) (1) provides:
The defendant within ten days of timely compliance by the prosecuting attorney but no later than five days prior to trial, or as otherwise ordered by the court, shall permit the prosecuting attorney at a time agreed to by the parties or as ordered by the court to inspect and copy or photograph books, papers, documents, photographs, tangible objects, audio and visual tapes, films and recordings, or copies or portions thereof and to inspect and photograph buildings or places, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in the defense's case-in-chief or rebuttal at the trial.

[5] OCGA § 17-16-6 provides in relevant part:
If at any time during the course of the proceedings it is brought to the attention of the court that the defendant has failed to comply with the requirements of [the reciprocal discovery procedures], the court may order the defendant to permit the discovery or inspection, . . . grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the defendant from introducing the evidence not disclosed . . . , or may enter such other order as it deems just under the circumstances.

10

App. 232, 234 (2) (679 SE2d 797) (2009). And, a defendant's failure to timely provide a document to the State, without more, is insufficient to show bad faith. See *Brown v. State*, 268 Ga. App. 24, 27 (2) (601 SE2d 405) (2004); *Williams v. State*, 256 Ga. App. 249, 251 (1) (568 SE2d 132) (2002).

In excluding the jail medical records as a discovery sanction, the trial court erred by failing to require the State to make the requisite showing of bad faith, as mandated by OCGA § 17-16-6. When the trial court heard the State's motion to exclude the jail medical records as a discovery sanction, defense counsel summarized her efforts to obtain the records and her communications with the State:

> I first learned about the x-rays, the medical records, in April of this year, and had a discussion about it with [the first prosecutor assigned to the case[6]] over the phone and via e-mail. This was April 24, 2013. I had sent a request to the jail but I didn't have a medical release signed by Ms. Phillips at that time. I told [the first prosecutor] that's what was going on and that I would keep him updated as I was looking for the medical records. I got the release from Ms. Phillips on May 9th, and the reason for that delay is in large part due to the fact that we had been in court.

---

[6] As previously noted, the prosecutor first assigned to the case had a medical emergency, resulting in the assignment of a second prosecutor to the case on the day the trial started. See supra note 3.

Requested the records. I followed up with [the first prosecutor] via e-mail. . . . that I was still waiting. He might have more luck getting the records as an arm of the State if he wanted to make an attempt. I spoke with [the first prosecutor] on May 12th, last Sunday, and let him know I'm still waiting on the jail records, just FYI.

After pretrial motions on Monday, [May] 13, I told [the second prosecutor] either right before we empaneled the jury or in response to her question of whether we have a list of witnesses, that as a head's up I told [the first prosecutor] I'm waiting on a copy of Ms. Phillips'[s] jail records; I haven't received them yet. She had x-rays taken. I'll let you know as soon as I know anything.

Defense counsel further stated that she ultimately received the jail medical records on May 15, 2013, at 4:05 p.m., which was the same time that they were produced to the second prosecutor.

The second prosecutor did not dispute defense counsel's recitation of her communications with the first prosecutor, and the second prosecutor further stated that while she did not specifically remember defense counsel mentioning the records to her before the jury was empaneled earlier in the week, she was "clearly not saying [that defense counsel] was lying" about what had transpired. Nor did the second prosecutor otherwise argue as part of the State's motion to exclude the records that

12

defense counsel acted in bad faith in failing to timely produce them. Instead, as a basis for the discovery sanction, the second prosecutor focused on the untimeliness of the defense's production of the records, and the fact that the State would have had time to interview the medical staff referenced in the records if the records had been produced earlier.

Based on the record before the trial court, there was no showing by the State of bad faith in the belated production of the jail medical records. Rather, the record reflects that defense counsel notified the State of her efforts to obtain the jail medical records and of her difficulty in obtaining them. Then, when defense counsel ultimately received the records, the records were provided to the State at the same time. There is no evidence that defense counsel made any effort to hide the jail medical records, and the second prosecutor herself noted that she was not arguing that defense counsel was being untruthful. Accordingly, as the record fails to show bad faith, the trial court erred in excluding the jail medical records as a discovery sanction instead of imposing a lesser sanction, such as granting the State a continuance to interview the jail medical staff. See OCGA § 17-16-6; *Massey*, 272 Ga. at 52 (4); *Mitchell v. State*, 326 Ga. App. 899, 901 (1) (a) (755 SE2d 308) (2014); *Webb*, 300 Ga. App. at 614; *Brown*, 268 Ga. App. at 27 (2); *Williams*, 256 Ga. App. at 251 (1).

13

Compare *Hudson v. State*, 284 Ga. 595, 596-597 (3) (669 SE2d 94) (2008) (trial court was authorized to find that defense counsel acted in bad faith, where counsel "knew about [a particular defense witness's] existence and had a plan to call him as a potential witness prior to trial, and yet failed to inform the State about [the witness] until the third day of trial").[7]

---

[7] The State also appeared to argue in the trial court that the jail medical records were inadmissible hearsay that should be excluded in their entirety because they contained observations of medical personnel and statements by Phillips. However, with respect to observations of medical personnel, we note that medical records, even if they include opinions and diagnoses of medical professionals, can be admitted under the business record exception to hearsay pursuant to OCGA § 24-8-803 (6). See *Samuels v. State*, 335 Ga. App. 819, 822-824 (1) (783 SE2d 344) (2016). Furthermore, with respect to statements by Phillips contained in the medical records, under the medical treatment or diagnosis exception to hearsay found in OCGA § 24-8-803 (4), "statements made for the purpose of obtaining medical treatment are admissible to the extent that the speaker is relating the cause of the injury or condition requiring treatment," or is providing a "description of the acts that resulted in the [patient's] injuries." *State v. Almanza*, 344 Ga. App. 38, 43 (807 SE2d 517) (2017), cert. granted (Mar. 5, 2018). In contrast, "statements identifying the person allegedly responsible for the [patient's] injuries are not admissible as statements made for the purpose of medical diagnosis and treatment." Id. at 44. Thus, Phillips's specific references to her boyfriend as her alleged attacker would have to be redacted from the jail medical records, but the references would not result in the exclusion of the records in their entirety. See, e.g., id. at 52 (those portions of statements to physicians identifying perpetrator were inadmissible); *Miller v. State*, 194 Ga. App. 533, 534 (2) (a) (390 SE2d 901) (1990) (portion of statement to medical provider identifying alleged attacker was inadmissible, but remainder of statement was admissible as a statement made for the purpose of describing medical history under former OCGA § 24-3-4).

14

Of course, "[e]rror alone is not automatically grounds for a new trial but is subject to scrutiny for harmless error." (Punctuation and footnote omitted.) *Brown*, 268 Ga. App. at 27 (2). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citations, punctuation, and footnote omitted.) *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016).

Here, the evidence presented at trial was not overwhelming, and the jury acquitted Phillips of one of the charged offenses. There was conflicting evidence as to whether Phillips acted in self-defense when she shot her boyfriend by attempting to fend off a violent physical attack, whether she sustained any visible injuries from the alleged attack, and whether she needed medical treatment based on the alleged attack. As previously noted, the jail medical records that Phillips sought to introduce showed that Phillips remained in the infirmary during her entire stay at the jail and included medical professionals' observations of her injuries on the day of the shooting, including "swelling to the nose, forehead, [and] a small bruise under her left eye," "bleeding from the right side of her nostril," and an "out-of-slope" nose. The

records further documented that Phillips was complaining of having trouble breathing through her nose and of having been struck in the nose and forehead, and that an x-ray of her nose was ordered "because of a blunt trauma to the nose and forehead contusion." A jury could find that these jail medical records, with their observations and diagnoses by medical professionals of Phillips's injuries and documentation of Phillips's complaints, provided "independent and objective support" to Phillips's trial testimony that she shot her boyfriend while being physically attacked by him, sustained visible injuries as a result of the attack, and needed medical treatment for her injuries. *State v. Simmons*, 321 Ga. App. 688, 695 (742 SE2d 505) (2013) (noting that records at issue supplied "independent and objective support" to other witness testimony and thus were of a "higher grade of evidence" than the other testimony). See *Ware*, 298 Ga. App. at 234-235 (2) (exclusion of evidence not harmless, where evidence would have corroborated defendant's testimony that went to his sole defense).

The State argues, however, that the exclusion of the jail medical records was harmless because the records are merely cumulative of the lead detective's supplemental police report and the affidavit and arrest warrant for the boyfriend,

which referenced visible injuries to Phillips.[8] We are unpersuaded under the circumstances here.

The supplemental police report, affidavit, and arrest warrant were dated October 17, 2010, the date of the shooting, and thus only reflected how Phillips's injuries appeared as of that date. In contrast, the jail medical records showed that Phillips had to remain in the infirmary for several days and included observations of how the swelling to Phillips's nose increased after October 17th and of her continued complaints of pain and difficulty breathing. The jail medical records, unlike the other documents, also reflected that Phillips's nose was still actively bleeding when she arrived at the infirmary hours after the shooting incident. These additional facts could have affected the jury's assessment of the severity of Phillips's injuries, and thus its assessment of Phillips's credibility in claiming that she was being violently attacked by her boyfriend when she shot him. As such, the jail medical records provided "new, distinct, and material facts" not encompassed by the supplemental police report,

---

[8] The State also contends that the jail medical records are merely cumulative of the boyfriend's testimony. While the boyfriend testified that Phillips told him that she was bruised and that her nose was broken, he further testified that he did not see any bruising or injuries on Phillips. Hence, the boyfriend provided no independent evidence that Phillips had visible injuries needing medical treatment; in fact, his testimony called into question Phillips's claim in that regard.

17

affidavit, and arrest warrant. *Humphrey v. State*, 207 Ga. App. 472, 474 (1) (428 SE2d 362) (1993) (testimony that would have provided additional facts to support defense theory of the case was not merely cumulative). See *Bell v. State*, 227 Ga. 800, 806 (3) (183 SE2d 357) (1971) ("Evidence is not merely cumulative, though it may have some bearing upon the main issue in controversy, if it relates to new, distinct, and material facts about which no witness testified at the trial.") (citation and punctuation omitted); *Lynn v. State*, __ Ga. App. __ (2) (b) (Case No. A17A2117, decided Mar. 15, 2018) (physical precedent only) (exclusion of testimony was not harmless, where the testimony provided several additional details that would have strengthened the defense). Furthermore, unlike the supplemental police report, affidavit, and arrest warrant, the jail medical records directly corroborated Phillips's claim that she had needed medical treatment as a result of her injuries. Thus, the jail medical records "suppl[ied] a link or gap missing in the previous testimony." (Citation and punctuation omitted.) *Bell*, 227 Ga. at 807 (3). Additionally, there was other law enforcement testimony presented at trial that conflicted with the lead detective's references to Phillips's visible injuries in his supplemental police report and warrant affidavit, the lead detective was deceased and thus could not substantiate what was stated in his report, and the arrest warrant for the boyfriend was never

18

executed. Under these combined circumstances, we cannot say that the jail medical records were merely cumulative of the lead detective's supplemental police report, the affidavit, and the arrest warrant.

Lastly, we conclude that the exclusion of the jail medical records was not harmless in light of the emphasis placed on the absence of medical testimony and records during the prosecutor's closing argument at trial. During closing argument, the prosecutor argued to the jury that the absence of medical testimony or records further demonstrated that Phillips was lying about her injuries and thus about being physically attacked when the shooting occurred:

> I hope that you can see through the smoke screen and realize who truly is the victim. But if you can't let me show you. [Indicating] She's sits here with no injury whatsoever. None. She's not in a wheelchair. She can walk into this courtroom, sit here with her lawyers, talk to them. [Her boyfriend] cannot. She wants you to believe that this woman is a battered woman and he's the batterer. . . . Because usually the person who is doing the battering don't wind up with injuries. The person who's doing the battering to someone else is always that person with that knife or that gun. It is not the person who sustained the injuries. That's how you tell who's running the show. . . .
>
> So this was not a justifiable shooting for self-defense. It did not happen that way. And if you said, . . . well, that's just the picture that

you took when she came to the jail. *Did you hear any – excuse me, did you see any doctors that told you she had a broken nose or swelling or anything? Nurses? Nobody took this stand to say she was physically injured but her. . . .*

Now she wants you to believe he pulled [her braids] out, *but did she go to get any medical treatment for it being pulled out? Nothing. No doctor's report, no nurse, no inmate who might have saw her. Nobody. Nobody except her.* And we all know she has a reason to lie. She has lied several times. . . .

*And not only have you not heard any medical testimony that would suggest she was injured*, you haven't heard from a girlfriend. You haven't heard from a neighbor. . . . You haven't heard from girlfriends, from neighbors – and I understand domestic violence people want [to] keep that close in the family – but out of eight years, something, somebody who can tell me [the boyfriend] is the one who beat up on you all the time. You haven't heard anything, nothing.

(Emphasis supplied.)

Furthermore, the prosecutor asserted during closing argument that the deceased lead detective's supplemental police report, the warrant affidavit, and the arrest

warrant should not be relied on by the jury as evidence that Phillips sustained any injuries during the shooting:

> If anything was correct in [the arrest warrant] or anybody believed that, then you would have [Phillips's boyfriend] sitting at [the defense] table. He would be charged. [The boyfriend] was never, never charged with any type of crime. Because you know what [the lead detective] did? He listened to both sides. And he, like you, decided there's nothing here. So nothing happened with that. So as she wants to stress that there was a warrant out for him, nothing happened with it. . . .

> [The lead detective] writes in a report that she told him that this is what happened. Do we really know if she had any injuries? We know what she told the detective, so this is what you do. The oldest trick in the book: You blame the dead police officer because you know the State can't come and cross him.

> But now surely [the detective] wasn't the only person who saw this. Surely if [the detective] wrote up that she was injured, surely somebody else saw that, surely there's another person who can say, yes, she was injured other than the defendant. There is nobody else. So you stick with the dead police officer because you know the State can't question him. Oldest trick in the book. Don't be fooled by all of this nonsense. It simply did not happen that way.

As the prosecutor illustrated through her closing argument, the presence or absence of medical testimony and records corroborating Phillips's claim was of particular import in this case, given the highly contested nature of the other evidence that was before the jury. Consequently, the prosecutor's closing argument further demonstrates that the exclusion of the jail medical records was not harmless. See *Neuman v. State*, 297 Ga. 501, 509 (2) (773 SE2d 716) (2015) (no harmless error, where, among other things, prosecutor referred to the contested evidence during closing argument to support the State's theory of the case); *Sanchez-Villa v. State*, 341 Ga. App. 264, 273 (1) (b) (799 SE2d 364) (2017) (no harmless error, where, among other things, the prosecutor referred multiple times to the evidence at issue during closing argument and "invited the jury to disregard [the defendant's] mere presence defense based on this evidence").

In sum, given the record in this case, we cannot say that it is highly probable that the trial court's error of excluding the jail medical records did not contribute to the judgment. Compare *Massey*, 272 Ga. at 51 (4) (trial court erred in excluding evidence as discovery sanction where there was no showing of bad faith, but error was harmless because the evidence of the defendant's guilt was overwhelming). We therefore reverse Phillips's convictions and remand this case for a new trial.

2. In light of our decision in Division 1, we need not address Phillips's remaining enumerations of error.

*Judgment reversed and case remanded for new trial. McMillian and Reese, JJ., concur.*