309 Ga. 240
FINAL COPY

S20A0119.  SMITH v. THE STATE.

BOGGS, Justice.

Appellant Olivia Smith challenges her 2017 convictions for felony murder and possessing a firearm during the commission of a felony in connection with the shooting death of her husband, Cory Smith. Appellant argues that the trial court erred in refusing to allow her expert witness to testify to out-of-court statements made by some of Appellant's family members and in excluding documents reflecting Cory's prior domestic violence against her. We affirm.[1]

---

[1] Cory was killed on April 2, 2015. On June 25, 2015, a Gwinnett County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). At a trial from October 9 to 13, 2017, the jury acquitted Appellant on Count 1 but found her guilty on all other counts. In November 2017, the trial court sentenced Appellant to life in prison for felony murder plus five years to be served consecutively on Count 4. The trial court merged Count 3 with the felony murder count. On November 7, 2017, Appellant filed a motion for new trial, which she amended on December 14, 2018, through new counsel. After an evidentiary hearing, the trial court denied the motion on December 31, 2018. Appellant filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2019 and submitted for decision on the briefs.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. Cory was physically violent toward Appellant in 2010 and again in January 2015. After each incident, Appellant obtained a temporary protective order ("TPO") against Cory. After the January 2015 incident, Appellant and Cory separated and were living apart, and she filed for divorce and obtained a handgun. By April 2, 2015, however, Appellant and Cory had begun dating again. Two of Cory's neighbors testified that they saw Appellant at Cory's apartment so often that they believed that Appellant lived there.

On the night of the crimes, Appellant went to Cory's apartment, where they argued. Appellant used her handgun to shoot Cory three times, striking him in the right thigh, next to his left eye, and behind his left ear, killing him. According to neighbors, the first shot was followed 30 to 60 seconds later by the second shot, which was followed 20 to 60 seconds later by the third shot.

More than an hour after the shooting ended, Appellant called 911. She reported that she was having a domestic problem with her

husband, said to "please come," and then hung up. The first police officer to arrive found Appellant on Cory's back patio, smoking a cigarette. Appellant spontaneously told the officer, "You need to arrest me," adding, "He's dead." Appellant had no apparent injuries, and her hair and clothing were not disheveled. Once a backup officer arrived, the first officer entered the apartment and found Cory dead, seated on a sofa in the living room with his right arm on the right armrest and his head leaning on his arm.

Appellant later told the police that when she attempted to leave Cory's apartment, he started walking toward her aggressively, at which point she brandished her handgun, told him that he would never threaten or hurt her again, and then fired at him once. She stated that Cory then backed up and screamed expletives, at which point she started firing again.

At trial, the medical examiner who performed the autopsy on Cory testified that he was likely seated when he was shot in the thigh. The medical examiner further testified that the handgun was approximately three feet away when Cory was shot next to his left

eye and that the handgun was less than one foot away when he was shot behind his left ear. Moreover, the medical examiner testified that bullet fragments found in Cory's lap were likely from the first gunshot he sustained to his head, and explained that those fragments entered his body near his left eye and exited through his open mouth.

The defense theory at trial was justification. Appellant testified that Cory physically and verbally abused her throughout their marriage and that he had been sexually violent with her. She stated that on the night of the shooting, when she got up and attempted to leave his apartment, he walked toward her and said that she "wasn't going anywhere," and in response, she drew her handgun. She testified that Cory laughed and said, "What are you going to do with that?" She said that she "couldn't stop him," explaining that he stepped toward her, lifted his right leg to clear a coffee table in front of the couch, and threatened to beat her with her handgun, at which point she fired at him once. She stated that Cory continued to advance on her while cursing, that she then closed

her eyes and fired at him at least one more time, and that he fell back on the couch. She added that she did not intend to kill Cory and that she shot him because she thought he was going to beat, rape, or kill her. The defense also called Dr. Marti Loring, who testified that Appellant suffered from mental health issues, including battered person syndrome ("BPS"). See OCGA § 16-3-21 (d). See also *Virger v. State*, 305 Ga. 281, 297-304 & n.9 (824 SE2d 346) (2019) (discussing battered person syndrome and use of expert testimony regarding BPS in murder cases to assist jury in evaluating claims of self-defense).

Appellant does not challenge the sufficiency of the evidence to support her convictions. Nevertheless, in accordance with this Court's usual practice in direct appeals in murder cases, we have reviewed the record and conclude that, when properly viewed in the light most favorable to the jury's verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which she was convicted. See *Jackson v. Virginia*, 443 U. S. 307,

319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Hoffler v. State*, 292 Ga. 537, 539 (739 SE2d 362) (2013) ("Issues of witness credibility and the existence of justification are for the jury to determine, and it is free to reject a defendant's claim that [s]he acted in self-defense.").

2. Appellant contends that the trial court erred in refusing to permit her expert witness, Dr. Loring, to testify to statements that some of Appellant's family members made to Dr. Loring that Dr. Loring considered in determining whether Appellant suffered from mental health issues, including BPS. Appellant argues that the statements were admissible under OCGA § 24-8-803 (4) (hereinafter "Rule 803 (4)") because they were made for the purposes of medical diagnosis or treatment, and under OCGA § 24-7-703 (hereinafter "Rule 703") because Dr. Loring relied on those statements in concluding that Appellant suffered from BPS. We conclude that Appellant has failed to demonstrate reversible error in this respect.

(a) During Appellant's case-in-chief, her counsel called Dr. Loring, who has a doctorate in psychology and a license in clinical

social work, to testify as an expert in abuse and trauma. Specifically, Dr. Loring testified about post-traumatic stress disorder and BPS, how Appellant developed these mental health issues, and how they affected her prior to and on the day of the shooting. Dr. Loring testified at length about the testing she performed on Appellant, as well as conversations she had with Appellant prior to making any diagnosis. The State did not object to any of this testimony until counsel asked Dr. Loring to describe any acts of sexual abuse Appellant had disclosed. The State then objected and argued that the defendant's statements to Dr. Loring were all self-serving hearsay. Defense counsel responded that all of the conversations Dr. Loring had with the defendant were admissible under Rule 803 (4). Counsel also informed the trial court that he would ask Dr. Loring about her conversations with five of Appellant's family members that she interviewed, arguing that those were also admissible under Rules 803 (4) and 703. During the exchange with the trial court, the following occurred:

COURT: Are you going to have [Dr. Loring] testify

to what a bunch [of the other people] said?

> [COUNSEL]: Yes.
> COURT: Statements that they made?
> [COUNSEL]: Yes.
> COURT: About what?
> [COUNSEL]: Her history, her medical history.
> COURT: And what rule of evidence is it you seek to admit this under?
> [COUNSEL]: Statements made for [the] purposes of [a] medical diagnosis.
> COURT: Well, this is not a medical doctor and she is not making a medical diagnosis.

The State agreed with the trial court and argued that although there was a diagnosis in a clinical sense, because Dr. Loring was "retained by the defense with an eye toward litigation," all of the statements made to Dr. Loring lacked sufficient indicia of trustworthiness. The trial court then sought the following clarification:

> COURT: [The State's] objection is, is that these are not statements made [for a] medical diagnosis or medical treatment; these are statements made for the purposes of defending a murder charge . . . [a]nd that it takes it outside the ambit of the statute. Is that your argument so far . . . ?
> [STATE]: Yes, sir. That's exactly it.
> COURT: All right. That's his argument.

Following additional argument by the parties, the trial court

permitted Appellant's counsel to proffer – outside the presence of the jury – the details of the statements Appellant's family members made to Dr. Loring, and Dr. Loring testified as follows: (1) Appellant's father indicated that Appellant "seemed depressed, terrified of Cory, would stare down at the floor when he would become angry and rageful [sic], stopped eating properly and seemed exhausted, not able to sleep"; (2) Appellant's sister Jessica "described seeing bruises on [Appellant], fingerprint bruises, like bruises on her arms, and she saw leg bruises as well and was told . . . by [Appellant] about [Appellant] being choked by Cory"; (3) Appellant's sister Jennifer "observed Cory calling [Appellant] demeaning names . . . [a]nd she saw . . . neck, wrist, arm[,] and back bruises on [Appellant]," and "witnessed Cory shoving [Appellant] into a wall while she was holding her son"; (4) Appellant's daughter Alexis stated "[t]hat her father would yell at her mother, that her mother was scared of her father and would cry," and that "she heard noises of her mother being slammed into the wall"; and (5) Appellant's mother indicated "[t]hat she had seen bruises, heard

Cory yelling at [Appellant], saw Cory become enraged and give [Appellant] a look that caused [Appellant] to look down and stop talking," and that "they moved to Georgia where she witnessed Cory trying to isolate [Appellant] from her family."

The parties and the trial court then continued with a long debate concerning the purpose of, and case law concerning, Rules 803 (4) and 703. During this exchange, the trial court noted:

> There's nothing about the nature of the relationship between the declarants and the defendant that causes me any trouble whatsoever. You know, I think all those people could legitimately make statements to medical personnel that could be made for the purposes of diagnosis, so I would not exclude them based on their position relative to the defendant. Okay. So I want to make sure y'all understand. I've decided that issue.

The prosecutor then urged the trial court to find the statements inadmissible on the basis that they were made in anticipation of litigation and not for the purposes of a medical diagnosis. The trial court agreed and then ruled as follows:

> I don't — you know, this is one of those situations where, because we got an evidence code that's less than four years old, we don't have a lot of case law to support the issue and some of the decisions that have to be made.

But I got to make a decision, in any event, and that's what I'll do.

I find that the statements made by third parties as outlined by the defense and Dr. Loring in this case do not qualify as statements made for the purpose of medical diagnosis or treatment. And for that reason, I find that they do not fall under the exception to the hearsay rule found in OCGA [§] 24-8-803 (4).

Following from that finding, I rule that although Dr. Loring is certainly able to consider those statements in her own right in making her opinions and arriving at her conclusions, even though they would be inadmissible hearsay, she can still obviously consider them.

I believe that she should be allowed, if you wish, [defense counsel], for her to testify that she in fact talked to all those people. She can testify that she got information from those people that she used in arriving at her opinion. I believe she could also qualify that by, if she has — if she has an opinion on how central those things were to her opinion, she can state that. But what she cannot do is outline specifically what those third parties told her.

(b) We review the trial court's ruling that the evidence was not admissible under Rule 803 (4) for abuse of discretion. See *Wade v. State*, 304 Ga. 5, 12 (5) (815 SE2d 875) (2018).

Hearsay is an out-of-court statement that a party offers into evidence to prove the truth of the matter asserted therein, and such a statement generally is inadmissible at trial. See OCGA §§ 24-8-

801 (c), 24-8-802. However, Rule 803 (4) provides:

> The following shall not be excluded by the hearsay rule,
> even though the declarant is available as a witness: . . .
> **Statements for purposes of medical diagnosis or
> treatment.** Statements made for purposes of medical
> diagnosis or treatment and describing medical history, or
> past or present symptoms, pain, or sensations, or the
> inception or general character of the cause or external
> source thereof insofar as reasonably pertinent to
> diagnosis or treatment[.]

(Emphasis in original.)

As we explained in *State v. Almanza*, 304 Ga. 553 (820 SE2d 1)
(2018), "the justification for the medical diagnosis and treatment
hearsay exception is the underlying guarantee of trustworthiness of
statements made for purposes of diagnosis or treatment." Id. at 559
(3) (citation and punctuation omitted).

> [S]tatements made to a provider for the purpose of
> diagnosis or treatment may be admissible because the
> self-interested motivation of the declarant in wanting
> effective diagnosis or treatment (for themselves or others
> about whose health they care) makes it more likely that
> the statements made for that purpose are true.

Id. at 561-562 (3) (citation and footnote omitted). In determining
whether a statement is admissible under Rule 803 (4), we ask

whether: (1) the declarant's motive in making the statement is consistent with the purposes of treatment; and (2) the content of the statement is the type reasonably relied upon by a physician in treatment or diagnosis. See *Almanza*, 304 Ga. at 561 (3). "[A]ssessing the validity of the declarant's 'motive' is critical" under this test. Id. at 562 (3).

Because OCGA § 24-8-803 (4) "materially mirrors Federal Rule [of Evidence] 803 (4)" and this Court has not yet decided the issue presented here, "we look to federal appellate precedent" for guidance. *Almanza*, 304 Ga. at 558 (2). For starters, the federal advisory committee notes to Federal Rule of Evidence 803 (4) states:

> Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify. While these statements were not admissible as substantive evidence, the expert was allowed to state the basis of his opinion, including statements of this kind. The distinction thus called for was one most unlikely to be made by juries. *The rule accordingly rejects the limitation*.

Fed. R. Evid. 803 (4), Advisory Committee Note (emphasis added).[2]

Moreover, the federal appellate courts that have addressed the specific issue in this case have concluded that statements made for medical purposes to experts hired in anticipation of litigation generally are admissible under Rule 803 (4). For example, in *United States v. Iron Shell*, 633 F2d 77 (8th Cir. 1980), the defendant challenged the testimony of one of the government's experts concerning statements made to the expert by the victim. The defendant argued, among other things, that because the government employed the doctor for the purposes of testifying as an expert at trial, any statements made to him were not trustworthy under Federal Rule 803 (4). The Eighth Circuit disagreed, explaining the change in the admissibility of statements under Rule 803 (4) as follows:

> It is clear that Rule 803 (4) significantly liberalized prior practice concerning admissibility of statements made for purposes of medical diagnosis or treatment. See Notes of Advisory Committee on Proposed Rules, Rule 803, 28

---

[2] "[A]lthough Advisory Committee Notes are not binding precedent and cannot change the plain meaning of the law or rules, they are highly persuasive . . . ." *Almanza*, 304 Ga. at 559 n.6 (citations omitted).

U.S.C.A. p. 585-86 (West 1975); 11 Moore's Federal Practice § 803 (4) (1976); 4 Weinstein & Berger, Weinstein's Evidence 803-125 (1979). Rule 803 (4) admits three types of statements: (1) medical history, (2) past or present sensations, and (3) inception or general cause of the disease or injury. All three types are admissible where they are "reasonably pertinent to diagnosis or treatment." The rule changed prior law in two main points. First, the rule adopted an expansive approach by allowing statements concerning past symptoms and those which related to the cause of the injury. Second, the rule abolished the distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only; the latter usually refers to a doctor who is consulted only in order to testify as a witness.

Id. at 83. The court noted that nothing in the record suggested that the victim's motive in answering the doctor's questions was "for any reason other than promoting treatment." Id. at 84. See also *United States v. Whitted*, 11 F3d 782, 787 (8th Cir. 1993) ("Rule 803 (4) applies to statements made for the sole purpose of diagnosis, which includes statements made to a doctor who is consulted only to testify as an expert witness."); *United States v. Iron Thunder*, 714 F2d 765 (8th Cir. 1983) (holding that rape victim's statements to non-treating physician were admissible under Rule 803 (4)).

Similarly, in *Morgan v. Foretich*, 846 F2d 941, 948 (4th Cir. 1988), a civil case, the defense objected to the admission of the assault victim's statements to the plaintiff's expert because the expert was consulted in order to testify as a witness rather than for treatment. The Fourth Circuit agreed with the reasoning set forth in *Iron Shell* and held that the statements were admissible under Rule 803 (4). *Morgan*, 846 F2d at 950. See also *United States v. Farley*, 992 F2d 1122, 1125 (10th Cir. 1993) (holding that comments made by child sex abuse victim to government's psychologist were admissible under Rule 803 (4)); *O'Gee v. Dobbs Houses, Inc.*, 570 F2d 1084, 1089 (IV) (2d Cir. 1978) (holding that, though defense's expert had not treated plaintiff and was retained for purposes of litigation, Rule 803 (4) permitted admission of plaintiff's statements to the expert concerning her condition, so long as they were relied on by doctor in formulating his opinion).

Although we view these cases as instructive, we have two main reservations about them. First, even though in *Almanza* we adopted the Eighth Circuit's two-part Rule 803 (4) admissibility test, which

originated in *Iron Shell*, we note that it is unclear the extent to which the federal courts that have had occasion to apply that test have meaningfully focused on whether the declarants' motives in making the statements were consistent with the purposes of diagnosis or treatment, and that assessment is the "critical" first step in our Rule 803 (4) analysis. See *Almanza*, 304 Ga. at 562, 563 n.11 (explaining that "assessing the validity of the declarant's 'motive' is critical" under this test and concluding that "fail[ing] to focus on the essential element of motive, . . . is a mistake"). And while we remain convinced that the Rule 803 (4) test we adopted in *Almanza* is the right test and that statements made to an expert consulted to testify at trial are not categorically excluded under Rule 803 (4), we view the aforementioned cases unpersuasive to the extent that they suggest that the question of admissibility under Rule 803 (4) is anything other than a case-specific, fact-intensive inquiry.

Secondly, and more critically, all of the federal criminal cases discussed above were decided prior to the United States Supreme

Court's landmark decision in *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004), in which the Court held that the admission at trial of the defendant's wife's pretrial statement to police implicating her husband in the charged crime violated the Sixth Amendment's Confrontation Clause because that statement was testimonial and the defendant's wife did not testify at trial and thus was not subject to cross-examination. See id. at 68. Therefore, none of the courts deciding the cases cited above had occasion to consider whether admitting the non-testifying declarants' statements to medical professionals consulted solely to testify at trial violated the defendants' Sixth Amendment right to confront their accusers. And while we recognize the importance of that question, we need not decide it here because Appellant sought to have the statements at issue admitted at trial and the State has no confrontation rights. *State v. Hamilton*, 308 Ga. 116, 120 n.5 (839 SE2d 560) (2020) (noting that "Confrontation Clause protections are not available for the State to assert").

(c) In any event, pretermitting whether the trial court erred in

ruling that Appellant's family members' statements were inadmissible under Rule 803 (4), we conclude that any such error was harmless. See *Kirby v. State*, 304 Ga. 472, 478 (819 SE2d468) (2018) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.)). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). In considering whether a trial court's evidentiary error harmed an appellant, "we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." *Boothe v. State*, 293 Ga. 285, 289 (745 SE2d 594) (2013).

Even though the trial court precluded Appellant from offering through Dr. Loring statements made by five of Appellant's family members that indicated that Cory had abused Appellant on multiple prior occasions, she was allowed to offer a substantial amount of

evidence that clearly showed Cory had abused her quite severely on numerous occasions in the years prior to the shooting. That evidence included, among other things: (1) the domestic-violence TPOs Appellant obtained against Cory after he abused her in 2010 and 2015; (2) Appellant's testimony that throughout their nearly 14 years as a couple, Cory had on many occasions abused her emotionally, physically, and sexually; (3) photographs taken in 2015 of bruises on Appellant's, which she testified were the product of a violent attack Cory perpetrated against her; (4) Dr. Loring's testimony that Appellant suffered from BPS and other mental health issues and that she felt "fear and terror" in her relationship with Cory, all brought about by the emotional, physical, and sexual abuse that Cory had inflicted on her; and (5) Dr. Loring's testimony that, in summary, many individuals suffering from the same mental health issues with which she diagnosed Appellant often have significantly impaired decision-making abilities (especially when dealing with stressors brought on by their abuser) and may therefore react to their abusers' advances or threats in a panicked,

impulsive fashion. As such, the jury was presented with a substantial amount of evidence from which it could have concluded that Appellant suffered from BPS and that her actions on the night in question were the product of her mental state.[3]

Moreover, at trial the State presented evidence that substantially undermined Appellant's BPS-based justification defense. Significantly, the forensic evidence showed that Appellant likely shot and killed Cory while he was seated on his couch with his arm up on an armrest, and that the second bullet that struck him in the head was fired from less than one foot away. That evidence was inconsistent with Appellant's pretrial statement that Cory backed up after she fired the first shot. Most significantly, two of Cory's neighbors testified that they heard three gunshots and that the first

---

[3] As proffered, Appellant's family members' statements likely would not have significantly improved the probability that the jury would have accepted her BPS-based justification defense. The information Appellant's family members provided Dr. Loring was largely cumulative of the evidence of abuse Appellant was allowed to offer, and to the extent that information could have served to corroborate Appellant's testimony as to the abuse she suffered at Cory's hands, there was little need for additional corroboration in light of the aforementioned evidence of abuse and the State's concessions that Cory had abused Appellant on at least two prior occasions.

gunshot was followed 30 to 60 seconds later by the second shot, which was followed 20 to 60 seconds later by the third shot. Given the forensic evidence and that timeline, the jury had ample reason to reject Appellant's justification defense. Therefore, in light of the substantial evidence admitted at trial showing that Cory had abused Appellant quite severely on numerous occasions, and given that other properly admitted evidence significantly undermined Appellant's justification defense, we conclude that it is highly probable that any error in the trial court's exclusion of the statements at issue did not contribute to the verdicts. See *Kirby*, 304 Ga. at 478. Accordingly, any such error was harmless.[4]

3. For the first time on appeal, Appellant argues that the aforementioned statements made to Dr. Loring were also admissible as prior consistent statements under OCGA §§ 24-6-613 (c) and 24-

---

[4] We also conclude that, pretermitting whether the trial court erred in finding that the statements at issue were inadmissible under Rule 703 for the sole reason that they were inadmissible under Rule 803 (4), any such error was equally harmless for the reasons stated above.

8-801 (d) (1) (A).[5] Because Appellant did not raise this claim in the trial court, we review it only for plain error, which requires Appellant to show that: (1) there was an error that she did not affirmatively waive; (2) the error was obvious; (3) the error affected her substantial rights, which means that she must demonstrate that it likely affected the outcome of the proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). See also OCGA § 24-1-103 (d).

---

[5] OCGA § 24-6-613 (c) says:

A prior consistent statement shall be admissible to rehabilitate a witness if the prior consistent statement logically rebuts an attack made on the witness's credibility. A general attack on a witness's credibility with evidence offered under Code Section 24-6-608 or 24-6-609 shall not permit rehabilitation under this subsection. If a prior consistent statement is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, the prior consistent statement shall have been made before the alleged recent fabrication or improper influence or motive arose.

OCGA § 24-8-801 (d) (1) (A) says:

An out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement or a prior consistent statement under Code Section 24-6-613 or is otherwise admissible under this chapter.

Under our Evidence Code, a *witness'* prior consistent out-of-court statement is admissible to rehabilitate *that witness* if the statement logically rebuts an attack made on the witness' credibility *and the witness testifies at trial and is subject to cross-examination.* See OCGA §§ 24-6-613 (c), 24-8-801 (d) (1) (A).

Here, even if the statements at issue could have served to rebut Detective Matthew Kenck's testimony that Appellant's pretrial account of Cory's behavior prior to the shooting was not consistent with the physical evidence and that he was unable to gain access to photographs showing that Cory had abused Appellant on a prior occasion, those statements were not admissible as prior consistent statements because Appellant's family members did not testify at trial. See OCGA §§ 24-6-613 (c), 24-8-801 (d) (1) (A). Accordingly, Appellant has failed to show that the trial court plainly erred in this respect.

4.  Appellant contends that the trial court erred in excluding the petitions for TPOs against Cory that she filed in 2010 and 2015 and a written statement that she gave to the United States Naval

Criminal Investigative Service ("NCIS") in 2010 concerning abuse she suffered at Cory's hands. She argues that Detective Kenck attacked her credibility by insinuating that she lied to him during her pretrial interview about when she fired at Cory and that she had photographs showing that Cory had abused her on prior occasions. According to Appellant, this testimony by Detective Kenck made the TPO petitions and her statement to NCIS admissible as prior consistent statements under OCGA §§ 24-6-613 (c) and 24-8-801 (d) (1) (A). We disagree.[6]

At trial, Detective Kenck testified in relevant part that: (1) Appellant's description, during her pretrial interview, of Cory's actions prior to her shooting him was not consistent with the physical evidence; and (2) although Appellant told him during her pretrial interview that she had photographs of bruises Cory had given her on prior occasions, he was unable to access those

[6] Appellant also contends that the trial court erred in preventing her from introducing the TPOs themselves. However, the record shows that the TPOs were admitted into evidence at trial.

photographs.[7] At most, then, Detective Kenck's testimony called into question Appellant's pretrial account of Cory's actions on the night of the shooting and her claim that she had photographs proving that Cory had previously abused her.

OCGA § 24-6-613 (c) provides that for a witness' prior consistent statement to be admissible to rebut an express or implied charge of — among other things — recent fabrication by the witness, the witness' prior consistent statement must "logically rebut" that charge. We conclude that Appellant's prior TPO petitions and NCIS statement would not have logically rebutted any suggestion by Detective Kenck that Appellant's description of Cory's actions just before the shooting did not jive with the physical evidence. And assuming for the sake of argument that Detective Kenck's testimony that he could not access the photographs at issue implied that Appellant fabricated her claim that Cory had abused her on prior

---

[7] As to the photographs, Detective Kenck testified that: (1) Appellant claimed they were on her cell phone, but he could not access them because Appellant did not give him the correct password; and (2) Appellant also claimed that her divorce attorney had those photographs, but that the attorney did not give him access to them.

occasions and that Appellant's TPO petitions and NCIS statement could have logically rebutted that implication, we hold that any error in not admitting the documents was harmless because as discussed above, at trial, the TPOs themselves and the photographs at issue were admitted into evidence, the State conceded during its opening statement and closing argument that Cory had abused Appellant prior to the night in question, Dr. Loring testified that Appellant suffered from BPS as a result of the abuse that Cory inflicted upon her, and Appellant testified in detail to the events that formed the basis of the TPO petitions and NCIS statement. In that light, we hold that it is highly probable that any such error did not contribute to the verdicts. See *Kirby*, 304 Ga. at 478.[8] Finally, we have also considered collectively any trial court errors in this case, and conclude that the cumulative prejudicial effect of any such errors does not require a new trial. See *State v. Lane*, 308 Ga. 10, 17

---

[8] Appellant also appears to argue, for the first time on appeal, that the same documents were admissible under another hearsay exception (such as OCGA § 24-8-803 (8)). To the extent she does so, any such error is harmless for the reasons stated above.

(838 SE2d 808) (2020) (adopting the cumulative error rule).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder. Gwinnett Superior Court. Before Judge Tom Davis.
*Wayne L. Burnaine*, for appellant.
*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Daniel Sanmiguel, Elizabeth H. Brock, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.