318 Ga. 868
FINAL COPY

S24A0236. SMITH v. THE STATE.

PINSON, Justice.

Truman Harry Smith shot and killed Johnnie Crawford while the two were hanging out with friends. At trial, Smith claimed he killed Crawford in self-defense. But the jury rejected that defense and convicted Smith of felony murder and other charges. On appeal, Smith contends that the trial court should have allowed him to testify that he suffered from post-traumatic stress disorder (rather than allowing him only to describe his symptoms), and that the trial court should not have allowed the State to impeach him with his prior charge for impersonating another under Article 134 of the Uniform Code of Military Justice. But the rule of evidence that Smith claims should have allowed him to testify that he had post-traumatic stress disorder—a hearsay exception for statements for the purpose of medical diagnosis—does not apply to medical diagnoses them-

selves, and any error in allowing the State to ask about Smith's military charge was harmless. So we affirm Smith's convictions and sentence.

1. Smith was convicted of felony murder and other crimes in connection with the shooting death of Crawford.[1] The evidence at trial showed the following.[2]

---

[1] The shooting happened on September 15, 2016. On August 16, 2021, a DeKalb County grand jury indicted Smith for malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. Smith was tried by a jury from August 16 to 20, 2021. The jury did not reach a verdict on the malice murder count, but it found Smith guilty of the remaining counts. Smith was sentenced to life in prison for felony murder and a consecutive five-year prison term for possession of a firearm during the commission of a felony, for a total sentence of life plus five years. The aggravated assault count merged into the felony murder count for sentencing, and the trial court dead-docketed the malice murder count. Through new counsel, Smith filed a timely motion for new trial, which he amended twice. On July 17, 2023, the trial court denied the motion for new trial, as amended. Because the dead-docketed malice murder count rendered the judgment non-final, see *Seals v. State*, 311 Ga. 739 (860 SE2d 419) (2021), the trial court also granted a certificate of immediate review, and we subsequently granted Smith's application for interlocutory appeal. Smith filed a timely notice of appeal. The case was docketed to the term of court beginning in December 2023 and submitted for a decision on the briefs.

[2] In light of the harmless-error analysis we undertake in Division 3 of this opinion, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." See *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022) (citation and punctuation omitted).

On the night of the shooting, Smith, Crawford, and two other men, Dulles Smith (Smith's cousin) and Randy Castillo, met up at Castillo's home. Dulles and Castillo had known each other for years, and both of them also knew Smith and Crawford, but the evidence conflicted as to whether Smith and Crawford met for the first time that night (as Smith said) or had known each other before (as Dulles and Castillo said). At Castillo's house, the four of them sat in the back of Crawford's truck drinking beer and tequila and smoking marijuana. At first the group was relaxed, laughing and joking. But at some point Smith pulled out a handgun and pointed it at Crawford. Castillo and Dulles asked Smith what he was doing. Smith replied, "Man, my fault. I'm tripping, man," and said he was going to put away the gun. Smith went over to Dulles's car, then returned to the back of the truck, where he resumed talking with the group.

Some time after that, Smith pulled out his gun again and shot Crawford in the face. The evidence conflicted as to whether this happened right when Smith rejoined the group (as Smith said), or some-

what later after he temporarily reconciled with—and even embraced—Crawford (as Dulles and Castillo said). Dulles saw the shooting. Castillo, who had just gotten up to go inside, did not see it, but when he looked back he saw Crawford "falling" into the tailgate of his truck and knew Smith was the shooter because he was the only one with a gun when the shot was fired. Neither Dulles nor Castillo recalled any argument between Smith and Crawford before the shooting.

Dulles immediately drove Smith back to Dulles's house, where Smith got in his own car and left. Dulles then returned to the scene of the shooting. Castillo, meanwhile, had rushed inside and called 911. When investigators arrived, Dulles told them that Smith was the shooter. Five days later, Smith was pulled over for speeding in Missouri. The Missouri officer ran Smith's driver's license, learned that a warrant for his arrest had been issued in Georgia, and placed him under arrest.

Smith testified in his own defense. He admitted he shot Crawford, but he said he did so because he feared for his life. Smith said

the first time he pulled out his gun was in response to Crawford's threat to rob him like he had robbed "other country motherf**kers." Smith showed Crawford his gun at that point as part of a "de-escalation" technique he had learned in the military: "shout, show, shove, shoot." The situation de-escalated, and Smith put away the gun and walked away to calm down. But after Smith came back to the group, Crawford said, "[Y]ou're not the only motherf**ker with a gun," and reached behind him. Smith knew Crawford had a gun and that he was a "Blood gangbanger." He shot Crawford to "eliminate[ ] the threat." Smith then fled the scene because he feared "more Bloods were coming out." Later, he left the state to see a friend in Las Vegas. When he was arrested in Missouri, he was on his way back to Georgia to "take care of business."

2. Smith contends that the trial court erred by not allowing him to tell the jury that he suffered from post-traumatic stress disorder (PTSD) and instead allowing him only to describe his symptoms. Smith had indicated before trial and in his opening argument that his defense would rely at least in part on the effects of PTSD on his

5

mental state, but because he did not introduce a medical expert or other evidence to establish the diagnosis, the State objected to Smith testifying about PTSD. The State argued that Smith was not a medical expert and could not testify about a medical condition. But Smith's counsel argued that Smith had been diagnosed with PTSD by two physicians, "and so he should be allowed to testify that he has PTSD based on that diagnosis." The trial court agreed with the State and ruled that Smith, as a lay witness, could not testify about a "clinical medical diagnosis," but that he could describe his symptoms. Smith then testified that he had served in combat in Iraq, where, among other things, he was trained to "identify the threat and eliminate the threat." Since his return home, he remained "hypervigilant." He had trouble concentrating, was sensitive to loud noises, avoided having his back to doorways or having people behind him, and had nightmares from which he "would wake up yelling, gasping for air." He also told the jury that he was prescribed antidepressants and pills to control his nightmares, but they did not help, so he self-medicated with marijuana.

Because Smith made the substance of his proposed testimony known to the trial court and received a definitive ruling on the record, the issue is preserved for ordinary appellate review. See OCGA § 24-1-103 (a); *McGarity v. State*, 311 Ga. 158, 162 (2) (856 SE2d 241) (2021) ("to preserve an objection to the exclusion of evidence the proponent must either make an offer of proof or otherwise ensure that the *reason* for offering the evidence in question is apparent to the trial court" (cleaned up)).

On appeal, Smith contends that his PTSD diagnosis is a hearsay statement and that it is admissible under an exception to the general rule of hearsay. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Hearsay is generally not admissible, see OCGA § 24-8-802, but it may be admitted if it falls under any of several statutory exceptions. See id. One of those exceptions applies to out-of-court statements "made for purposes of medical diagnosis or treatment and de-

scribing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." OCGA § 24-8-803 (4) ("Rule 803 (4)"). In Smith's view, his PTSD diagnosis fits that exception, and the trial court was wrong to exclude it.

The trial court did not err by excluding Smith's hearsay statement that he had PTSD, because the hearsay exception of Rule 803 (4) does not apply to medical diagnoses. Instead, the rule applies to out-of-court statements that patients make to medical professionals to help the patients *get* a diagnosis or treatment. The rule refers to statements "describing medical history, . . . symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof." OCGA § 24-8-803 (4). Those are things a patient would tell a doctor—some of which are uniquely within the patient's knowledge, like his "pain" and "sensations"—when he is seeking treatment for a complaint or ailment. Such statements are admissible despite being hearsay because the patient has an incentive to tell

8

the truth under those circumstances. See *State v. Almanza*, 304 Ga. 553, 561-562 (3) (820 SE2d 1) (2018) ("[S]tatements made to a provider for the purpose of diagnosis or treatment may be admissible because the self-interested motivation of the declarant in wanting effective diagnosis or treatment . . . makes it more likely that the statements made for that purpose are true.") (citing *White v. Illinois*, 502 U.S. 346, 356 (112 SCt 736, 116 LE2d 848) (1992)). And when we apply Rule 803 (4), we ask whether the statement in question enjoys the "guarantee of trustworthiness" that comes from a patient's desire to get the right treatment when he describes his symptoms to a medical professional. See *Smith v. State*, 309 Ga. 240, 245 (2) (b) (845 SE2d 598) (2020) (quoting *Almanza*, 304 Ga. at 559 (3)) (a statement may be admissible under Rule 803 (4) if (1) the "declarant's motive in making the statement is consistent with the purposes of treatment" and (2) the statement is of a type "reasonably *relied upon by a physician* in treatment or diagnosis" (emphasis added)). All of which is to say that the language of Rule 803 (4), the justification behind it, and our case law applying it all confirm that

9

it generally applies to statements made by patients to medical professionals, not to the resulting diagnoses.

Smith points out that we expect doctors to be honest with their patients, just as we expect patients to be honest with their doctors, so Smith repeating a diagnosis he was given by a doctor should have the same hallmarks of reliability that allow other types of hearsay to be admitted at trial. But the justification for Rule 803 (4)—the "guarantee of trustworthiness" that attaches to a patient's factual description of his symptoms—does not apply in the same way to a diagnosis, because a doctor's diagnosis is generally considered an expert opinion, not a factual assertion. See, e.g., OCGA § 24-7-701 (a) (3) (a witness may not give an opinion that is "based on scientific, technical, or other specialized knowledge" unless she is qualified as an expert); OCGA § 24-7-704 (b) (restricting an "expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding" from opining on whether the defendant had the required mental state to be guilty of the charged offense); *Middlebrooks v. State*, 315 Ga. 671, 689-690 (2) (b) (884 SE2d 318) (2023)

(discussing various mental health experts' opinion testimony about the defendant's diagnosis); *Adams v. State*, 275 Ga. 867, 870 (572 SE2d 545) (2002) (Carley, J., concurring) ("[s]ince paranoia and schizophrenia are medical terms relating to mental disorders, only a qualified expert such as a psychiatrist, psychologist, or medical doctor would be competent to diagnose and define such a mental disorder" (citation and punctuation omitted)).[3] Expert opinions are just that—opinions—and are subject to different standards of reliability and trustworthiness that govern their admission. See generally OCGA § 24-7-702 (discussing qualifications for experts and expert opinions). We have never, so far as we can tell, applied Rule 803 (4) to determine whether an expert opinion was admissible.[4]

---

[3] To be clear, while a diagnosis is generally an expert opinion, doctors and other medical professionals can also provide fact or lay testimony. See *McKelvin v. State*, 305 Ga. 39, 42-43 (2) (b) (823 SE2d 729) (2019) (distinguishing between a doctor testifying about his drug-testing decisions and offering his opinion on whether the defendant could have been on substances that were not tested for, which would be expert testimony, and the doctor merely reporting the results of the drug tests that were performed, which could be lay testimony).

[4] To the extent that a patient's *past* diagnosis is a fact that could be established by a lay witness—a question we do not decide here—Smith did not seek to introduce his diagnosis that way. He offered no authenticated medical

In sum, Rule 803 (4) has consistently been applied to allow the introduction of statements made to medical professionals, not medical diagnoses, and Smith cites no authority (nor are we aware of any) supporting the introduction of a medical diagnosis under that rule. The trial court therefore did not err by preventing Smith from testifying that he had PTSD.

3. Smith also contends that the trial court erred by allowing the State to impeach Smith with his prior charge under the Uniform Code of Military Justice (UCMJ). We review a trial court's evidentiary rulings for abuse of discretion. See *Eubanks v. State*, 317 Ga. 563, 584 (6) (894 SE2d 27) (2023).

Smith had called a character witness, Jerry Mike, Smith's former sergeant from the military, who testified that he would believe Smith if Smith testified under oath. On cross-examination, the State asked whether Mike's opinion would change "if [he] learned that

---

record or other proof of a past diagnosis. See OCGA § 24-7-701 (a) (defining the limited circumstances in which a lay witness can provide testimony "in the form of opinions or inferences"). Instead, he sought to testify that doctors had told him he had PTSD. And as discussed above, he argues that the hearsay exception of Rule 803 (4) allowed him to do so.

Truman Smith had been charged in the military with fraudulent use of another's identity to avoid arrest or detection under Article 134 of the Uniform[ ] Code of Military Justice." Smith objected that he had never been convicted of that charge, so it was not properly admitted as impeachment evidence. See OCGA § 24-6-609 (allowing for a criminal defendant to be impeached with prior convictions under certain circumstances). But the State argued that the question fell under OCGA § 24-6-608 (b), which allows a party to impeach a witness with "[s]pecific instances of the conduct of [the] witness" if the conduct is "probative of truthfulness or untruthfulness." The trial court overruled the objection based on OCGA § 24-6-608 (b), and Mike then testified that the UCMJ charge would not change his opinion of Smith's truthfulness.

When a witness has testified about the truthful character of a second witness, as Mike did for Smith, the first witness (here, Mike) can be cross-examined about specific instances of the second witness's conduct (here, Smith's conduct) that are probative of the second witness's character for truthfulness. See OCGA § 24-6-608 (b)

(2). But Smith points out on appeal that his UCMJ charge for fraudulent use of another's identity did not contain any information about Smith's conduct that led to the charge, only that he was administratively discharged from the military as a result. In Smith's view, that means the UCMJ charge is not a "specific instance[ ]" of conduct under OCGA § 24-6-608 (b) (2).

Assuming without deciding that Smith is right that it was an abuse of discretion to allow the State to ask Mike about the UCMJ charge, the error was harmless. A non-constitutional evidentiary error is harmless if it is "highly probable that the error did not contribute to the verdict." *Talley v. State*, 314 Ga. 153, 160 (2) (875 SE2d 789) (2022). That test is satisfied here. At trial it was undisputed that Smith fatally shot Crawford, so the only question was whether he did so in self-defense. Both third-party eyewitnesses, Dulles and Castillo, testified that they did not recall any argument between Smith and Crawford and that Smith shot Crawford suddenly and without provocation. The only evidence to counter Dulles's and Castillo's accounts was Smith's self-serving testimony that Crawford

14

had threatened him and appeared to be reaching for a gun. Compared with that mix of evidence, the fact that Smith had been charged with the non-violent offense of impersonating another was highly unlikely to have swayed the jury against him. Indeed, Mike even testified that the UCMJ charge would not affect his opinion of Smith's truthfulness, which the jury could have viewed as mitigating against any prejudice the revelation of the UCMJ charge may have caused. Because the UCMJ charge was highly unlikely to have made a difference given the evidence as a whole, any error in allowing the State to ask about it was harmless. See *Johnson v. State*, 316 Ga. 672, 683-684 (4) (c) (889 SE2d 914) (2023) (harmless error to admit single pre-autopsy photo of victim given strong evidence of defendant's guilt and the fact that the photo was less graphic, and thus less likely to sway the jury, than other evidence); *Young v. State*, 309 Ga. 529, 536-538 (3) (847 SE2d 347) (2020) (harmless error to admit photo of defendant holding a gun where evidence of defendant's guilt was strong and the evidentiary value of the photo was "marginal").

*Judgment affirmed. All the Justices concur.*

Decided April 30, 2024.

Murder. DeKalb Superior Court. Before Judge Hydrick.

*Daniel H. Petrey*, for appellant.

*Sherry Boston, District Attorney, Roderick B. Wilkerson, Deborah D. Wellborn, Ashley C. O'Neal, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Sarah J. Thomas, Elizabeth H. Brock, Assistant Attorneys General*, for appellee.